1  LAW OFFICES OF YOLANDA HUANG
   YOLANDA HUANG, SBN 104543
2  475 14th Street, Suite 500
   Oakland, CA 94612
3  Telephone: (510) 329-2140
   Facsimile:  (510) 580-9410
4

5  DENNIS CUNNINGHAM, SBN 112910
   115A Bartlett St.
6  San Francisco, CA 94110
   Telephone: 415-285-8091
7  Facsimile:  415-285-8092
8

9  Attorneys for Plaintiffs

10

11              IN THE UNITED STATES DISTRICT COURT

12        FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| **ALAMEDA COUNTY WOMEN PRISONERS** And Former Prisoners & Pregnant Prisoners, JACLYN MOHRBACHER, ERIN ELLIS, DOMINIQUE JACKSON, CHRISTINA ZEPEDA, ALEXIS WAH, AND JAMIE JOHNSTON, KELSEY ERWIN, DENISE ROHRBACH, SHANI JONES, ANDRANIA YANCY, DAWN DEDRICK, JAMILA LONGMIRE, SANDRA GRIFFIN, NATALIE GARRIDO, JAZMINE TATE, MONICA NUNES, ANDANNA IBE, MARCAYSHA ALEXANDER, DIAMOND COOPER, MARY MAPA, ROSE PEREZ, MARTINA GOMEZ, TIKISHA UPSHAW, ANNETTE KOZLOWSKI And JANE DOEs Nos. 1-- X, on behalf of themselves and others similarly situated, <u>as a Class, and Subclass</u> | No. 3:18-cv-00050-JD |
| **PLAINTIFFS,** | **THIRD AMENDED COMPLAINT** for INJUNCTIVE RELIEF AND DAMAGES FOR VIOLATION OF CIVIL RIGHTS and OTHER WRONGS |
| vs. | |
| **ALAMEDA COUNTY SHERIFF'S OFFICE**, GREGORY J. AHERN, BRETT M. KETELES, TOM MADIGAN, T. POPE, T. RUSSELL, D. SKOLDQVIST, LT. HATTAWAY, SGT. CALAGARI, DEPUTY DIVINE (#512), | **JURY TRIAL DEMANDED** |

DEPUTY DEBRA FARMANIAN, DEPUTY
WEATHERBEE (#238), DEPUTY TANIA
POPE, DEPUTY WINSTEAD, DEPUTY
CAINE, ALAMEDA COUNTY and John & Jane
DOEs, Nos. 1 - 50.
                **and,**
**The CALIFORNIA FORENSIC MEDICAL
GROUP**, a corporation; its Employees and Sub-
Contractors, and Rick & Ruth ROEs Nos. 1-50,
                **and,**
**ARAMARK CORRECTIONAL SERVICES,
LLC**, a Delaware Limited Liability Company; its
Employees and Sub-Contractors, and Rick and
Ruth ROES Nos. 51-100.

                **DEFENDANTS.**

Plaintiffs JACLYN MOHRBACHER, ERIN ELLIS, and DOMINIQUE JACKSON, now joined by others named within, on behalf of themselves and those they speak for and seek to represent herein---along with those others now named and to be named individually as plaintiffs---for themselves and others, pursuant to the Court's discussion with Counsel at the status call on January 8, 2018, and as of right per R.15(a) F.R.Civ P, now submit this amended version (TAC) of their previously filed Complaint, as follows.   The allegations in the complaint are based on the knowledge of the Plaintiffs as to themselves and as to conditions and acts which they have personally observed, and on information and belief, including the investigation of counsel, as to all other matters.

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which the Plaintiffs, on behalf of themselves and a class of similarly situated individuals, seek relief for Defendants' violations of Plaintiffs' rights and

privileges secured by the First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution.

2.      Defendants CALIFORNIA FORENSIC MEDICAL GROUP and the ALAMEDA COUNTY SHERIFF'S OFFICE have implemented and enforced, and without the Court's intervention will continue to implement and enforce, a policy, practice, and/or custom of denying women prisoners at Santa Rita Jail necessary and appropriate medical care, in violation of the Eighth Amendment and State standards.

3.      Defendants ARAMARK CORRECTIONAL SERVICES, LLC and the ALAMEDA COUNTY SHERIFF'S OFFICE have implemented and enforced, and without the Court's intervention will continue to implement and enforce, a policy, practice, and/or custom of denying women prisoners at Santa Rita Jail food that is adequate to maintain health, in violation of the Eighth Amendment and State standards.

4.      Without the Court's intervention, the Defendants in this action will continue to deny women prisoners at Santa Rita Jail necessary and appropriate medical care and food that is adequate to maintain health, in violation of the Eighth Amendment and State standards.

5.      Without the Court's intervention, the Defendants in this action will continue to violate all women prisoners at Santa Rita Jail First Amendment right to file grievances concerning the illegal and unconstitutional policies, practices and customs that are continually perpetrated by Defendants at the SRJ.

6.      Without the Court's intervention, the Defendants in this action will continue to violate each individual's Fourth and Eighth Amendment rights to be free from unlawful searches by continuing to use strip and body cavity searches conducted outside of prisoners' cells as a means to

punish inmates for filing grievances and as reprisals and punishments for other acts real or imagined, with no valid penological purpose.

7.     This action seeks to end the barbaric conditions at SRJ regarding medical care and food.  These practices result in almost universal and inevitable miscarriages suffered by women who enter SRJ while pregnant.  These practices include coercion by ACSO and CFMG staff to force inmates to have abortions.  These practices include the denial of materials necessary for personal hygiene with regard to inmates' menstrual cycle and reproductive systems.  The practices complained of herein are cruel and inhumane and violate the  most minimal standards of decency of a civilized society.

8.     Plaintiffs bring this action for injunctive relief, and for monetary damages, individually and on behalf of all others similarly situated who have been and will be incarcerated at Santa Rita Jail, and to redress all Defendants' violations of their rights under the First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION

9.     This action is brought pursuant to the First, Fourth, Fifth, Eighth, Thirteenth and Fourteenth Amendments to the United State Constitution, by way of the Civil Rights Acts, 42 U.S.C. §§1981, 1983 et seq. and 1988.

10.     Jurisdiction is conferred upon this Court by 28 U.S.C. §1331 (claims arising under the United States Constitution) and §1343 (claims brought to address deprivations, under color of state authority, of rights privileges, and immunities secured by the United States Constitution), and, by pendent jurisdiction, Secs. 52.1, and 50, of the California Civil Code and the aforementioned statutory and constitutional provisions.

11.     Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and causes of action which derive from the same nucleus of

operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## VENUE AND INTRADISTRICT ASSIGNMENT

12.     The claims alleged herein arose in the County of Alameda, State of California. Therefore, venue and assignment, under 28 U.S.C. § 1391(b), lies in the United States District Court for the Northern District of California, San Francisco Division or Oakland Division.

## JURY DEMAND

13.     Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

## PLAINTIFFS

14.     Plaintiffs are all former and current prisoners incarcerated at the Santa Rita Jail.  All Plaintiffs seek to represent a class of women imprisoned at the Santa Rita Jail at any time since January 4, 2016, two years prior to the date of filing of the Original Complaint in this action.

15.     Plaintiffs MARCAYSHA ALEXANDER, ANDANNA IBE, ANDRANIA YANCY, SANDRA GRIFFIN, DIAMOND COOPER, MARY MAPA, ROSE PEREZ, TIKISHA UPSHAW, ANNETTE KOZLOWSKI , DENISE ROHRBACH are currently incarcerated prisoners in Santa Rita Jail.

16.     Plaintiffs ALEXIS WAH, KELSEY ERWIN, SHANI JONES, DAWN DEDRICK, JAMILA LONGMIRE, NATALIE GARRIDO, JAZMINE TATE, MONICA NUNES, MARTINA GOMEZ, ERIN ELLIS, DOMINIQUE JACKSON, are women who were formerly imprisoned at Santa Rita jail.

17.     JACLYN MOHRBACHER and CHRISTINA ZEPEDA are formerly pregnant prisoners who suffered a miscarriage due to the mistreatment received at the hands of defendants,

while under the custody and control of the Alameda County Sheriff's Office.  Plaintiffs

MOHRBACHER and ZEPEDA seek to represent a Subclass of pregnant Santa Rita Jail prisoners.

18.     Plaintiff JAIME JOHNSTON is a pregnant prisoner under the custody and control of

the Alameda County Sheriff's office.  Plaintiff JAIME JOHNSTON wishes to carry her pregnancy

to term and to deliver and have a healthy baby, and accordingly wants and demands no less than the

minimum necessary nutrition, medical and other support which that requires and to which they are

entitled by the U.S. Constitution.  Along with Plaintiffs MOHRBACHER and ZEPEDA, Plaintiffs

ELLIS, JACKSON, and JOHNSTON also seek to represent a Subclass of pregnant Santa Rita Jail

prisoners.

## DEFENDANTS

### Alameda County Defendants

19.     Defendant ALAMEDA COUNTY SHERIFF'S OFFICE ("ACSO") is a "public

entity" within the definition of Cal. Govt. Code § 811.2.

20.     Defendant GREGORY J. AHERN is, and at all times relevant to this Complaint was,

the Sheriff of Alameda County.  As Sheriff of Alameda County, Defendant Ahern has at times

relevant to this Complaint held a command and policy making position with regard to County Jails,

including Santa Rita Jail.  Defendant Sheriff AHERN has caused, created, authorized, condoned,

ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions,

actions, policies, customs and practices that prevail at Santa Rita Jail, as described fully below.

Sherriff AHERN has, wholly or in part, directly and proximately caused and, in the absence of the

injunctive relief which Plaintiffs seek in this Complaint, will continue in the future to proximately

cause, the injuries and violations of rights set forth fully below. Defendant Sheriff AHERN is sued

in his official capacity only.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

21.     Defendant BRETT M. KETELES is, and at all times relevant to this Complaint was, the Assistant Sheriff of Alameda County in charge of the Detentions and Corrections Unit ("DCU"), which includes the Santa Rita Jail. As Assistant Sheriff of Alameda County in charge of DCU, Defendant KETELES has at times relevant to this Complaint held a command and policy making position with regard to County Jails, including Santa Rita Jail.  Defendant Assistant Sheriff KETELES has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at Santa Rita Jail, as described fully below.  Assistant Sheriff KETELES has, wholly or in part, directly and proximately caused and, in the absence of the injunctive relief which Plaintiffs seek in this Complaint, will continue in the future to proximately cause, the injuries and violations of rights set forth fully below. Assistant Sheriff KETELES is sued in his official capacity only.

22.     Defendant TOM MADIGAN is, and at all times relevant to this Complaint was, the Commander in Charge of DCU, which includes the Santa Rita Jail. As the Commander in Charge of DCU, Defendant MADIGAN has at times relevant to this Complaint held a command and policy making position with regard to County Jails, including Santa Rita Jail.  Defendant MADIGAN has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at Santa Rita Jail, as described fully below.  Defendant MADIGAN has, wholly or in part, directly and proximately caused and, in the absence of the injunctive relief which Plaintiffs seek in this Complaint, will continue in the future to proximately cause, the injuries and violations of rights set forth fully below. Defendant MADIGAN is sued in his official capacity only.

23.     Defendant T. RUSSELL is, and at all times relevant to this Complaint was, the Detention and Corrections Commander of ACSO.  As the Detention and Corrections Commander of

ACSO, Defendant RUSSELL has at times relevant to this Complaint held a command and policy making position with regard to County Jails, including Santa Rita Jail.  Defendant RUSSELL has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at Santa Rita Jail, as described fully below.  Defendant RUSSELL has, wholly or in part, directly and proximately caused and, in the absence of the injunctive relief which Plaintiffs seek in this Complaint, will continue in the future to proximately cause, the injuries and violations of rights set forth fully below. Defendant RUSSELL is sued in his official capacity only.

24.     Defendant D. SKOLDQVIST is, and at all times relevant to this Complaint was, the Watch Commander for Santa Rita Jail.  Defendants T. RUSSELL, LT. HATTAWAY, and SGT. CALIGARI are, and at all times relevant to this Complaint were responsible officers for Santa Rita Jail.  At all times relevant to this Complaint, Defendants SKOLDQVIST, RUSSELL, HATTAWAY, and  CALIGARI were employees of the Sheriff who held supervisory, command and/or policy-making positions, and who participated in the authorization, planning, supervision, and execution of the conduct complained of herein.  Defendants SKOLDQVIST, RUSSELL, HATTAWAY, and CALIGARI are sued in their official capacities only.

25.     Defendants Deputies DIVINE, FARMANIAN, CAINE, POPE, DEPUTY 'A', and DEPUTY "S", were guards and deputies on duty at Santa Rita Jail with direct control over plaintiffs and class members.  Defendants DIVINE, FARMANIAN, CAINE, POPE, DEPUTY 'A', and DEPUTY "S" are sued in their official capacities only.

26.     Each and every Defendant named herein was at all times relevant to this Complaint an officer or employee of the Alameda County Sheriff's Office, acting under the color of law within the

1    meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of ASCO and within the scope of

2    their employment with ASCO.

3

4                                    **The Private Contractor Defendants**

5

6            27.    Defendant CALIFORNIA FORENSIC MEDICAL GROUP ("CFMG") is an active,

7    domestic, for-profit corporation incorporated in the State of California with its principal place of

8    business in San Diego, California.   Defendant CFMG contracts with ASCO to provide general

9    medical, dental, prenatal and opioid treatment services at Santa Rita Jail.  Defendants RICK and

10   RUTH ROEs 1-50 are CFMG employees who work at Santa Rita Jail.  At all times relevant to this

11   Complaint, Defendants CFMG and RICK and RUTH ROEs 1-50 were agents of the Alameda

12   County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. § 1983, and

13   acting pursuant to the authority of ASCO and within the scope of their agency with ASCO.

14

15           28.    Defendant ARAMARK CORRECTIONAL SERVICES LLC ("ARAMARK") is an

16   active, foreign, for-profit Limited Liability Company registered in the State of Delaware and

17   licensed to do business in the State of California.  Defendant ARAMARK contracts with ASCO to

18   operate the kitchens at Santa Rita Jail for the purpose of feeding Santa Rita prisoners, and for the

19   purpose of preparing food to feed prisoners at other Alameda County jails.  Defendants RICK and

20   RUTH ROEs 51-100 are ARAMARK employees who work at Santa Rita Jail.  At all times relevant

21   to this Complaint, Defendants ARAMARK and RICK and RUTH ROEs 51-100 were agents of the

22   Alameda County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. §

23   1983, and acting pursuant to the authority of ASCO and within the scope of their agency with

24   ASCO.

25

26

27

28

**CLASS ALLEGATIONS**

29.   Pursuant to Rules 23(a), (b2) and (b)(3) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a Plaintiff class consisting of all women incarcerated at Santa Rita Jail ("SRJ")from January 8, 2016 to the present.  All such women inmates were denied access necessary and appropriate medical care and all such women inmates were denied access to food that is adequate to maintain health in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

30.   The members of the class are so numerous as to render joinder impracticable.  In the year from July 2016 through June 2017 alone, over 9,700 women are incarcerated at SRJ.

31.   In addition, joinder is impracticable because, upon information and belief, many members of the class are not aware of the fact that their constitutional rights were violated and that they have the right to seek redress in court.  Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.  There is no appropriate avenue for the protection of the class members' constitutional rights other than a class action.

32.   The class members share a number of questions of law and fact in common, including, but not limited to:

a)   whether the members of the class were denied access to necessary and appropriate medical care;

b)   whether the members of the class were denied access to food that is adequate to maintain health;

c)   whether ACSO and CFMG jointly established and implemented policies specifically designed and intended to deny access to necessary and appropriate medical care in order to increase the profits of CFMG and to reduce ACSO's costs;

d)      whether ACSO and ARAMARK jointly established and implemented policies specifically designed and intended to deny access to food that is adequate to maintain health in order to increase the profits of ARAMARK and to reduce ACSO's costs;

e)      whether ACSO established and implemented policies in violation of the Fourth, Eighth and Fourteenth Amendments in order to control the female population of SRJ and intimidate and prevent that population from filing grievances against unlawful practices at SRJ;

f)      whether ACSO established and implemented policies in violation of the First and Eighth and Fourteenth Amendments in order to control the female population of SRJ and intimidate and prevent that population from filing grievances against unlawful practices at SRJ;

g)      whether ACSO established and implemented policies in violation of the Fourth, Eighth and Fourteenth Amendments which discriminated against the female population of SRJ by denying them necessary laundry, means of sanitation and feminine hygiene pads, fewer opportunities for classes, fewer opportunity to work and get out of their cells; in order to reduce ACSO's costs;

h)      whether at all times relevant to this Complaint Defendant CFMG acted under color of State law;

i)      whether at all times relevant to this Complaint Defendant ARAMARK acted under color of State law;

j)      whether the members of the class were prevented by fear of retaliation and reprisal by reclassification and/or transfer into solitary confinement, from engaging in the right to file grievances against unlawful practices at SRJ.

33.   The Plaintiffs' claims are typical of those of the class.  Like the other members of the class, the Plaintiffs were victims of the Defendants' policy, practice, and/or custom of preventing access to appropriate and necessary medical care; laundry and undergarments that meet minimum community standards; materials necessary for personal hygiene with regard to their menstrual cycle and reproductive system; and the right to be free of infliction of frequent and repeated strip and body cavity searches that are conducted outside prisoners' cells, for no valid penological reason, and as retaliation for and as a deterrent to the filing of inmate grievances.

34.   The legal theories under which the Plaintiffs seek relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the Plaintiffs are typical of the harms suffered by the class members.

35.   The Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interests with members of the class, and will fairly and adequately protect the interests of the class.  The Plaintiffs have all been subject to conditions of confinement that violate the First, Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution.

36.   The Plaintiffs are represented by experienced civil rights and class action counsel. Plaintiffs' Counsel have the resources, expertise, and experience to prosecute this action.  Plaintiffs' Counsel know of no conflicts among members of the class or between the attorneys and members of the class.

37.   The Plaintiff class should be certified pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to class members, the interests of the Plaintiffs and potential class members are aligned, and a class action is superior to other available methods for fairly and efficiently adjudicating the case.

## STATEMENT OF FACTS

### General Conditions For Women Inmates At SRJ

38.     SRJ's treatment of and rules and regulations governing women prisoners are not equal to, are more restrictive and far more harsh than, SRJ's rules and regulations governing male prisoners.

39.     Holding cells are in area called Intake, Transfer and Release ("ITR").  Any prisoner coming into or going out of SRJ must go through ITR, including each and every time a prisoner goes to court.  Male prisoners are always processed through ITR before women prisoners.  Because all prisoners entering or leaving SRJ on a given day arrive at ITR at approximately the same time, women prisoners are thus systematically held in holding cells for a far longer time than are male prisoners.  Holding cells are concrete boxes, which are almost always very cold and filthy.  They are rarely cleaned and are full of garbage.  Because women are processed after the jail is finished processing the men, women are held for significantly longer periods of time in these awful holding cells.

40.     Women have fewer jobs available to them, and the jobs are not as good.

41.     Women have fewer educational classes available for them, and the classes are less relevant to what women are interested in or want to learn.

42.     Women are strip searched more frequently than men, even under the same situation and circumstance.  For example, women are always strip searched or have body cavity searches when we return to our housing units after a work shift.  Men are not.

43.     In the medium security Housing Unit 24, women prisoners are housed in groups of 18, in bunk beds.  With this many women, there are always some who are menstruating, and frequently several.  Instead of finding out how many women are menstruating, SRJ Deputies hand out a small

number of menstrual pads, such 8 or 10, regardless of how many women are menstruating.  The pads are tiny and thin to begin with.  As a result, there are routinely insufficient menstrual pads, such that women bleed through their clothes.  Because laundry is only once a week, women are forced to endure dirty bloody clothing for long periods of time.  And if the laundry is short, as it often is, a prisoner can be stuck in disgusting, filthy, blood stained clothes for longer than a week.

44.     While State regulations mandate that women prisoners have clean laundry once a week, and clean underwear twice a week, women prisoners are never provided with clean underwear, much less once a week.  As to other clothing, SRJ staff frequently tells women prisoners that they ran have out of women's clothing.  This is especially difficult for women because the rules require us to wear bras, and they are generally in the wrong sizes and in short supply.

45.     Underwear is distributed once a week, contrary to regulation, and is not clean when it is distributed.  It is normally stained and has pubic hairs stuck to it.  Many prisoners hand wash the supposedly clean laundry exchange underwear in the shower in a bucket.  When they do so, the water coming off the laundry exchange underwear is brown.  The condition of underwear distributed by SRJ is a major cause of the transmission of bacteria from vaginal fluids that are not laundered out by SRJ.  This has resulted in an epidemic of trichomonas vaginalis among women prisoners.

46.     Other clothing is also often returned from laundry exchange blood-stained and dirty. Therefore, most women prisoners try to hand wash clothes to guarantee some level of personal hygiene.  However, SRJ does not provide soap.  A prisoner who cannot obtain soap from the commissary has no way to clean her clothes.

47.     Women inmates at SRJ receive fewer privileges than men and are subject to more restrictions, with no valid penological interest.  They have less access to yard time and exercise opportunities.  There is a Big Yard which has grass and open space.  Male prisoners regularly have

access to the Big Yard.  Women almost never have access to the Big Yard and are almost always given access for outside recreation only to a concrete pen that is open to the outside only at the top. The sides of this pen are concrete walls.  There is no grass or open space in the concrete pen.

48.     Women inmates at SRJ have fewer freedoms than male inmates.  For example, during meal times, women are prohibited from conversing.  If someone speaks, the entire pod is frequently punished and deprived of privileges.  During meal times, we cannot even choose where to sit.  The guards will tell us where to sit.  Male prisoners are not subject to the same meal-time restrictions.

49.     Filing a complaint or grievances leads to retaliation and reprisals.  Guards will place a woman prisoner into isolation or solitary confinement as punishment for filing a complaint or grievances.  They will take away privileges including denial of POD time or outside recreation time, not just for the individual but for the entire pod.  The guards will threaten to search individuals or the group.  The guards will turn the bright overhead lights on at night to disturb the women prisoners sleep.  The guards have carte blanche to do searches, including strip searches and body cavity searches.  The humiliating and degrading process of undergoing a strip search or a body cavity search is used to discourage and prevent the filing of complaints and grievances.  Guards will threaten to impose the degrading and humiliating process of a strip search or body cavity search as punishment

50.     Strip and body cavity searches are frequently conducted outside of a prisoner's cell, in a multi-purpose room.

### Sheriff Ahearn's Private Contracts for Food & Medical Services

51.     Over the past five years, Sheriff Ahearn has overseen an unprecedented increase in the salaries of Sheriff's office personnel at Santa Rita Jail.  Salaries and benefits at SRJ have increased by $12.44 million dollars since 2013.  As a result, being a jail guard at SRJ is one of – if not the

most – remunerative jobs in the entire country that a high school graduate with no college education can get.  A starting jail guards make approximately $100,000 per year in salary and benefits.  This is not counting overtime payments available.

52.     That $12.4 million dollar salary increase, and the $1.7 million increase in overtime between 2013 and 2018 amounted to almost 50% of the Sherriff's office SRJ budget increases over that period.

53.     Over the same period, while remuneration for Sheriff's office deputies and personnel at SRJ increased by nearly 18%, the SRJ jail population for whom the Sherriff was responsible, *declined*.

54.     According to ACSO, the average daily population at SRJ was 3,431 inmates in June 2013 and had fallen to 2,825 by June 2015.  Upon information and belief, the average daily population is now between 2,200 and 2,500.  Thus, the population at SRJ has declined by about 30% at the same time that remuneration for Sheriff's office deputies and personnel at SRJ increased by over 18%.

55.     Moreover, during this period, ACSO entered into contracts with private, for-profit companies to provide basic and crucial services to SRJ inmates.

*ACSO's Contract with CFMG*

56.     In this regard, ACSO contracts with Defendant CFMG to provide all health care services of any type needed by any inmate at SRJ.  CFMG's contract specifies a set price based on average daily inmate population ("ADP").

57.     Crucially, the CFMG contract specifies that CFMG itself is solely responsible for all costs incurred in connection with any health care services provided to inmates outside the jail and that CFMG is not entitled to and will not receive any reimbursement from ACSO for the cost of

services provided to inmates by hospitals or by any non-CFMG personnel. The cost for all such services is borne solely by CFMG.

58.    ACSO's contract with CFMG explicitly states that CFMG will pay for any and all "inpatient hospitalization costs, emergency room visits, ambulance transportation expenses, outpatient surgeries, outpatient physician consultations, outside specialist fees, off-site diagnostic procedures." If an inmate receives such medical services, CFMG must pay the total cost of the medical care provided, "regardless of the level of cost incurred."

59.    The contract specifies that CFMG alone will determine "the necessity and appropriateness of inpatient hospital care and other outside medical services."

60.    Incredibly, the contract also specifies that in the event a third-party payor such as an insurer pays for part or all of any medical service provided to an inmate outside the walls of SRJ, CFMG must turn over half of that third-party payment to the Sheriff's office. In other words, even if CFMG is reimbursed for its costs for outside medical care provided to inmates, the Sheriff's office takes half of the reimbursement even though it paid nothing for the outside medical care.

61.    By requiring CFMG to pay for any and all medical care provided outside of SRJ to any SRJ inmate, and by limiting CFMG's ability to recover any amount CFMG pays for such care, ACSO's contract with CFMG creates a financial incentive and imperative for CFMG to refuse and withhold needed and appropriate outside medical services to all inmates, including pregnant inmates, when the needed and appropriate medical services consist of "inpatient hospitalization costs . . . outpatient physician consultations, outside specialist[s, or] off-site diagnostic procedures," among other services.

62.    By specifying that CFMG alone will determine "the necessity and appropriateness of inpatient hospital care and other outside medical services," ACSO's contract with CFMG enables

CFMG to refuse and withhold needed and appropriate outside medical services to SRJ inmates, including pregnant inmates, when the needed and appropriate medical services consist of "inpatient hospitalization costs . . . outpatient physician consultations, outside specialist[s, or] off-site diagnostic procedures," among other services.

63.     "[O]utpatient physician consultations, outside specialist[s and] off-site diagnostic procedures" within the meaning of the CFMG contract include any outside or off-site OBGYN services, including prenatal care, provided to pregnant SRJ inmates.

64.     "[I]npatient hospitalization costs" within the meaning of the CFMG contract includes hospitalization of an SRJ inmate to deliver a baby or for other prenatal care.

65.     The medical provider in the San Francisco County jail is not a for-profit correctional healthcare company such as CFMG.  It is the County Department of Public Health, which has no financial incentive to deny care.

66.     The medical provider in the Contra Costa County jail is not a for-profit correctional healthcare company such as CFMG.  It is the County Department of Public Health, which has no financial incentive to deny care.

67.     The price provisions of the CFMG contract which create a financial incentive to deny care have had a devastating impact on the provision of medical services to inmates at SRJ, including pregnant inmates.  That impact is detailed below at Paragraphs 89 to 118.

*ACSO's Contract with ARAMARK*

68.     ACSO contracts with ARAMARK to prepare food for inmates at SRJ and to prepare food which is used to feed inmates at other Alameda County jails including Glen Dyer Jail, as well as adult facilities in Colusa, Solano, San Benito, San Joaquin, Amador and Lake counties, and a

juvenile facility in San Joaquin County.  ARAMARK prepares 20,000 meals a day, with the labor of 150 inmate workers who are not paid but receive food treats.

69.     Through its contract with ARAMARK, ACSO instituted a 25% cut in the inmate food budget at SRJ.

70.     ARAMARK implemented the reduction in the inmate food budget at SRJ in the amount of $1.65 million.

71.     The cost reductions which ACSO instituted in the ARAMARK contract and implemented by ARAMARK have had a devastating impact on the quantity and quality of food provided to inmates at SRJ.  That impact is detailed below at Paragraphs 71 to 88.

**Food Shortages and Dangerous Food Conditions at SRJ**

72.     The kitchen at SRJ is staffed by inmate workers under the supervision of Defendant ARAMARK.  By 2016, inmates were no longer even consistently tested for communicable diseases before being permitted to work in the kitchen.

73.     Santa Rita's kitchen prepares food not just for prisoners in the jail, but also for other jails under the jurisdiction of ACSO.

74.     According to an inmate kitchen worker at SRJ, the kitchen at SRJ is filthy.[1]  At least seven birds live in the kitchen and bird droppings fall all over counter surfaces, including food preparation surfaces.  Rats run across the kitchen floor and there are frequently rat droppings in the food.  When this is brought to the attention of a paid ARAMARK supervisor, paid supervisors brush the rat droppings off the food and instruct inmate kitchen workers to continue working.

---

[1] The inmate kitchen worker who has provided the information contained in paragraphs __ - __ fears reprisals at the hands of SRJ Deputies.  She is happy to provide her full identity to the Court *in camera*, or under Seal.

75.     Food in the kitchen is kept such that rats access it.  Bread is kept in plastic bags in open plastic crates.  Rats climb over the bread and chew open packages.  When bread bags are chewed by rats, a few pieces are thrown away but the rest of the bread is served to prisoners.

76.     Sandwich meat, primarily bologna, often is spoiled, with raised white spots of unknown origin and type on it.  That spoiled meat is given to prisoners to eat.

77.     Cooked beans are not properly stored, and not labeled, so that old, leftover beans are frequently reheated and served, or combined with newer cooked beans.  As a result, the beans decompose, and frequently become slimy and start to bubble as part of its bacterial decomposition. These decomposing spoilt beans are regularly served to prisoners.

78.     There is no soap in the kitchen bathroom, and no paper towels.  In every commercial kitchen, there is a sign saying it is the law that kitchen staff must wash their hands after using the bathroom.  Clean hands require soap and water.  Inmate kitchen workers have no way to clean their hands and their hands are not clean after they use the bathroom.  The kitchen bathroom is also very dirty.

79.     Commercial kitchens normally have a daily clean-up crew which comes in and cleans all ovens, stoves, venthoods, floors, and other surfaces and equipment in the kitchen.  Commercial clean-up crews normally come in the early morning, before a commercial kitchen opens.  Inmate kitchen workers have never seen a clean-up crew at the SRJ kitchen.  It is clear, simply by looking at the SRJ kitchen, that it is never cleaned.

80.     The walk-in refrigerators in the SRJ kitchen are disorganized and filthy.  There is no cleaning schedule for the refrigerators, which are seldom if ever cleaned.  Water collects on the floor, indicating condensation due to frequent temperature variations above acceptable food safety levels.

81.     Ingredients are not marked or dated when they are received into the kitchen so there is no way to track use-by dates of the inventory.  As a result, kitchen workers are unable to tell which ingredients should be used first or to follow standard first-in, first-out inventory control to prevent spoilage.  As an inevitable result, ingredients frequently spoil.  Sandwich meats are frequently become green or purple.  Beans become slimy and bubble.  Meals prepared from these spoiled ingredients are given to inmates to eat.

82.     Meals are the same day in and day out.  Even pregnant women do not receive sufficient amounts or types of food.  Day after day, week after week, month after month, prisoners are given:

<u>Breakfast</u>: oatmeal or Cream of Wheat with bread and canned fruit;

<u>Lunch</u>: Primarily Peanut butter sandwich or 1-2x a week, hard boiled eggs; once every two weeks or so some bologna, milk and 4 to 5 carrot nubs; a piece of fruit once or twice a week at most;

<u>Snack</u>: (for pregnant women only) Peanut butter sandwich, milk;

<u>Dinner</u>: Protein patty, potatoes, cooked carrots.

83.     On a daily basis, breakfast is served between 3:30 and 4:00 a.m.  Pregnant inmates, who need rest, are woken at 2:00 a.m. to have vital signs checked, are then forced to get up at 4:00 a.m. if they want to have breakfast.  Many cannot, because they need to rest.  If a pregnant woman skips breakfast, she must wait until 12:00 noon for lunch.  From dinner to lunch is 19 hours, so a pregnant woman who cannot rise at 4:00 a.m. after having been woken at 2:00 a.m. for a blood pressure check must go 19 hours without food.

84.     Pregnant women are not provided with adequate amounts or types of food as defined by community standards memorialized in California Regulations governing the feeding of California inmates.  Pregnant women fail to gain weight as is necessary for a healthy pregnancy.

85.     Podworkers report that there are regularly vermin and vermin feces in the food and food trays.  Plaintiff JOHNSTON reported that while serving meals, she saw both rodent feces in one person's food tray and another tray with limbs and a rodent fetus cooked into the beans and served.  Plaintiff JOHNSTON brought this to the attention of Deputies Farmanian and Pope, who were on duty.  One of Deputies Farmanian or Pope took a picture of the tray, treating it like it was a joke.  The tray was then served to an inmate with instructions to "eat around it."  Another time, when a prisoner showed one of the deputies evidence that a rodent had eaten part of her lunch, one of the deputies, Farmanian or Divine said, "Mice gotta eat too".

86.     Food shortages lead to frequent fights among the inmates for the little food that is available.  For example, on March 20, 2018, a pregnant pre-trial detainee was given one extra serving of milk.  Another inmate demanded that she turn over her extra milk.  A physical fight then ensued over that extra milk between the second inmate and a third inmate.  A second fight over milk also occurred during the same week.

87.     Plaintiff JOHNSTON was pregnant when she was arrested in early March, 2018 and booked into SRJ.  CFMG staff at SRJ confirmed her pregnancy upon her entry into SRJ.  Plaintiff JOHNSTON was not provided the extra food that is required for pregnant women.  Plaintiff JOHNSTON complained to the guards on Housing Unit 24 several times that she has not been given the required extra food and requested that she be given the food.  Despite her requests, SRJ staff did not provide Plaintiff JOHNSTON with the extra food required to be given to pregnant inmates.  Plaintiff JOHNSTON frequently falls asleep hungry.

88.     On March 10, 2018, despite the presence of extra trays at dinner, Defendant Deputy CAIN did not allow Plaintiff JOHNSTON to have any extra food.  On March 11, 2018, while lined up for breakfast, Plaintiff JOHNSTON fainted from hunger.

89.     On March 21, 2018, Plaintiff JOHNSTON asked for an extra tray of food because she was still hungry and there were extra trays visible. The deputy on duty denied her request and withheld the food as punishment citing as a reason that "you guys are being too loud."  Plaintiff JOHNSTON is a pre-trial detainee.

90.     On March 27, 2018, Plaintiff JACKSON, an inmate approximately 27 weeks pregnant at the time, was given food on a cardboard tray that was soggy and foul smelling because it was splattered underneath with food debris.  Plaintiff JACKSON asked the Deputy on duty, "would you eat this if the tray is soggy and smells bad?"  The Deputy said she would get Plaintiff JACKSON another tray, but did not.  On April 11, 2018 Plaintiff JACKSON was given spoiled milk to drink.

**Medical Care Is Grossly Inadequate At Santa Rita Jail**

91.     As a result of the cost provisions of ACSO's contract with CFMG, medical care provided to SRJ inmates at SRJ is grossly inadequate.   In addition, SRJ inmates are regularly denied necessary and appropriate outside medical care by CFMG because the provision of such care comes directly out of SFMG's bottom line profits. The following example of grossly inadequate and entirely withheld medical care are given by way of illustration only and not by way of limitation.

*General Medical Care*

92.     After experiencing chest pains while an inmate at SRJ, Plaintiff JOHNSTON was determined to have an abnormal heart rate and an abnormal heart valve in early March, 2018, by doctors at Highland Hospital who used an EKG and who said they would need to follow up with further testing.  Rather than returning Plaintiff JOHNSTON to Highland Hospital for the indicated testing, on March 11, 2018, CFMG staff at SRJ attempted conducted an EKG at SRJ.  Multiple attempts to conduct the EKG at SRJ were unsuccessful because the EKG equipment was not functioning properly.  Plaintiff JOHNSTON was not transported back to Highland Hospital.  Since

her initial diagnosis, Plaintiff JOHNSTON has not been transported back to the Hospital, has been given no further treatment, no final diagnosis, and no medication, and she has not seen a doctor.

93.     The Infirmary room where medical tests are conducted is filthy.  Inmates have reported that when being tested, they have experienced, "shit or cum on the seats like no one bothered to clean it."

94.     Plaintiff GARRIDO was an inmate podworker.  While waxing the floors one day, she slipped and fell badly, hitting her head.  Within twenty minutes, she started to have a severe headache, and the next morning could not get out of bed.  Plaintiff GARRIDO filed a request for medical examination.  Plaintiff GARRIDO received no medical examination or other care from CFMG.  CFMG only provided her with ibuprofen.

95.     Savanah O'Neill is a Certified Addiction Treatment Counselor and Associate Clinical Social Worker who served as the Opioid Treatment Program Coordinator at SRJ from February, 2017 through December 6, 2017 as an employee of CFMG.  She resigned her position with CFMG due to the "unethical medical treatment of pregnant inmates that falls below the accepted standard of care" at SRJ.

96.     Standard treatment protocols mandate that pregnant women prisoners with opioid dependence of any type are to be initiated into methadone treatment or maintained in their current treatment during their incarceration.

97.     Despite this, beginning in or about October, 2017, CFMG implemented its own, non-standard, practice.  Under its non-standard practice, CFMG puts all opioid  dependent inmates into detox, regardless of the prisoner's physical condition or opioid use history.  Although CFMG maintains written protocols which call for it to initiate treatment for pregnant women using opioids, Ms. O'Neill witnessed at least two pregnant women who were placed into a fast and severe detox

regimen.  One of these pregnant inmates was given one 5 mg dose of methadone and told she would receive no further medication; the other was given 10 mg.  Federal regulations, specifically 42 CFR Part 8 call for an initial dose of 40 mg on the first day of treatment, after which the dosage is increased every other day until cravings cease.

98.     The American College of Obstetricians and Gynecologists have issued an opinion that pregnant women should be maintained on methadone during their pregnancy and not placed in withdrawal.  CFMG and SRJ's treatment of pregnant prisoners with opioid dependence is contrary to the standards issued by the American College of Obstetricians and Gynecologists.

99.     CFMG and SRJ's practice is also contrary to the practice at the San Francisco County Jail and the Contra Costa County Jail, both of which comply with the accepted standard practice that all pregnant prisoners with opioid dependence be maintained on methadone during the term of their incarceration.  CFMG and SRJ do not comply.

*Pregnancy-Related Medical Care*

100.    Plaintiff JOHNSTON entered SRJ while pregnant.  Prior to her incarceration at SRJ, Plaintiff JOHNSTON was provided with a pregnancy treatment plan by the Native American Health Clinic.  The plan called for a standard test, called a nuchal translucency scan or NT scan, at 10-12 weeks pregnancy to gauge various developmental indicators, including development of the spinal cord, as well as other developmental milestones.  Plaintiff JOHNSTON has several times requested this test at SRJ.  CFMG staff initially told her only that "we will talk about it more."  On March 17, 2018 CFMG staff at SRJ denied her requests for the standard NT developmental scan.

101.    Plaintiff JOHNSTON has been diagnosed with gestational diabetes.   She was scheduled to be taken to Highland Hospital on Friday, March 16, 2018 for testing.  The test was administered instead by CFMG at SRJ.  CFMG staff administered the test incorrectly.  Blood sugar

readings are supposed to be taken twice, once before being given a drink and again afterwards. The test was administered only after the drink was given.

102.   Plaintiff IBE gave birth while she was a pre-trial detainee at SRJ.  At about the 37th week of pregnancy, she was moved to O.P.H.U. (Out-Patient Housing Unit), where she was frequently not given the diet mandated for pregnant women.  Despite her requests, SRJ did not provide her with proper meals on these occasions.

103.   While Plaintiff IBE was being transported to Highland Hospital, a male deputy attempted to restrain her in the ambulance with a waist chain while she was in active labor.  Plaintiff IBE gave birth on November 9, 2017.  After the birth, Deputy Thomas said they needed to chain her to the bed, despite the facts that she had a high fever and complications, including a rip in her vagina that needed to be stitched up.  Plaintiff IBE was not permitted to hold or even touch her baby.

104.   On November 10, 2017, two deputies grabbed Plaintiff IBE's legs and chained her to the bed with leg irons.  Although the tear in her vagina had just been stitched, they chained her to the bed in a spread-eagle position, leaving her uncomfortable and in pain with two male guards in her room.

105.   Also on November 10, 2017, a Highland Hospital pediatrician told Plaintiff IBE that the "County Sherriff made a rule" that "you cannot bond, hold, touch or see your baby."  Plaintiff IBE was not allowed any contact with her baby.

106.   Plaintiff ROHRBACH was incarcerated at SRJ in 2017.  While at SRJ, Plaintiff ROHRBACH observed an inmate named Candace, who looked very pregnant, complaining of not feeling well.  From her appearance, it was obvious to all of the female inmates on the Housing Unit that Candace was in her ninth month of pregnancy.  Candace was in so much pain that she could not walk but had to crawl on her hands and knees.  A CFMG nurse came to the Housing Unit and

examined Candace.  The CFMG nurse announced that Candace was not dilated, that Candace was only eight months pregnant, that Candace only had a stomachache, and that Candace was complaining and exaggerating her distress.

107.   The Deputies on duty, based on the CFMG nurse's statement that Candace was complaining and exaggerating her distress, placed Candace in an isolation cell as punishment.

108.   In the isolation cell, Candace was screaming and yelling in pain.  The Deputies closed the slider-window on the door to the cell to muffle the sound of her screaming.  Candace screamed in pain for hour after hour, past a shift change of the guards, and still no one did anything to help her.

109.   Finally, the screaming stopped and the other inmates heard the sound of a crying baby: Candace had given birth, alone, in pain, in an isolation cell at SRJ.  Only then did the Deputies open the door to her cell.

110.   Candace's baby was born with the umbilical cord wrapped around its neck.  Out of pure instinct, Candace put her fingers into the baby's mouth to open its airways so that the baby could start breathing.

111.   An SRJ inmate named Jenna had a history of seizures.  Before her entry into SRJ, she was on a prescription of 500 mg. per day of Dilantin, an anti-seizure and anti-convulsion medication.  When she arrived at SRJ, CFMG reduced her medication to 100 mg/a day of Dilantin.  As a result, Jenna had frequent severe seizures at SRJ.  CFMG did not increase her dosage.

112.   Plaintiff ELLIS was approximately 20 weeks pregnant at SRJ when she began bleeding and spotting.  CFMG placed her into the Infirmary, which consists of several small rooms, essentially cages, where she was totally alone.  She received no care other than periodic blood pressure readings.

113.   Until Plaintiff ELLIS was past four months pregnant, CFMG staff continually gave her pamphlets about abortion and told her that "abortion is available," despite her repeated statements that she wanted to carry the child to term.  Similarly, Plaintiff ELLIS heard CFMG staff repeatedly say that Plaintiff MOHRBACHER "needs to have an abortion."  SRJ guards have physically shaken and assaulted Plaintiff ELLIS, presumably in an attempt to induce a miscarriage.

114.   Plaintiff MOHRBACHER was pregnant when she entered SRJ.  Plaintiff MOHRBACHER has never been told of any of any "care plan" developed by CFMG for her pregnancy.  Like all pregnant inmates at SRJ, Plaintiff MOHRBACHER was not allowed the three hours of outdoor recreation per week mandated for pregnant inmates.  Other than for a single week when all female inmates were allowed regular outdoor time, Plaintiff MOHRBACHER was permitted only two pregnancy weeks walks while incarcerated at SRJ.

115.   Plaintiff MOHRBACHER was seen by CFMG staff in connection with her pregnancy. The CFMG staff had from the beginning of her pregnancy urged her to have abortion.  Plaintiff MOHRBACHER informed CGMG that she did not want an abortion and that she wanted to have the baby, the CFMG staff.  Following this, CFMG staff told Plaintiff MOHRBACHER that her baby was dead and that she should have an abortion.  Plaintiff MOHRBACHER knew that the baby was not dead and refused consent to an abortion.  CFMG nonetheless scheduled Plaintiff MOHRBACHER for an abortion.  When Plaintiff MOHRBACHER refused to go, CFMG had two male Deputies go to her Housing Unit and try to forcibly take her to have an abortion.  She resisted and refused, and when she again refused to agree to an abortion, the Deputies yelled at her and claimed she was on drugs.  Defendants Farmanian and Pope have told Plaintiff MOHRBACHER that she "needed to get" an abortion.  Defendant Pope told her that she must "obviously be on drugs, which is why you refuse" to abort the baby.

116.   Finally, one day in December, 2017, Deputies entered the Housing Unit at 6:00 a.m. and demanded that all inmates stand so that the Deputies could conduct a search.  Plaintiff MOHRBACHER was placed into solitary confinement, handcuffed, for an extremely long period of time.  After a significant amount of time, defendant DIVINE returned, moved Plaintiff MOHRBACHER to another room and conducted yet another strip search.  Plaintiff MOHRBACHER was bleeding vaginally due to the stress and harassment.  Although Plaintiff MOHRBACHER was not once found to be in possession of drugs at SRJ, Deputy DIVINE stated that she was bleeding because she was "doing meth."  During or shortly following this search, which was the third in less than a week, Plaintiff MOHRBACHER's continued bleeding and suffered a miscarriage.  CFMG never provided medical attention to Plaintiff MOHRBACHER in connection with her miscarriage.

117.   Plaintiff ZEPEDA was arrested and booked into SRJ on Sunday, August 13, 2017, at which time she was pregnant.  On that day, CFMG staff at SRJ administered a pregnancy test and confirmed the pregnancy.  Plaintiff ZEPEDA informed CFMG staff that she was not feeling well.  Nonetheless, she was placed in a filthy holding cell with walls covered in human secretions, decaying food on the floor, and human waste in the cell and in the toilet.  Because the toilet had human waste floating in it and no toilet paper, she could not use it and ended up urinating on her clothes.

118.   On the same day, although she continued to not feel well, Plaintiff ZEPEDA received no medical care.  Eventually, CFMG personnel spoke with her, but instead of trying to provide medical care, the CFMG staff only told Plaintiff ZEPEDA that she could have an abortion anytime.  The guards also encouraged her to have an abortion.  When Plaintiff ZEPEDA requested medical attention, such care was refused and she was instead treated as a pest.  Plaintiff ZEPEDA felt that

the guards were trying to coerce her into aborting her fetus or, failing that, into suffering a miscarriage.

119.   By Thursday, August 17, 2017, four days after entering SRJ, Plaintiff ZEPEDA was bleeding very badly and did suffer a miscarriage.  Grieving and distraught, she received no counseling or support of any kind.

120.   Other inmates, including Paramdeep Kaur, have also suffered miscarriages due to the filthy conditions, abuse by staff, and inadequate and dangerous food at SRJ, and due to the policy, custom and practice of ACSO and CFMG to deny needed and appropriate medical care to pregnant women at SRJ.

121.   Adanna Ibe was pregnant and delivered her son at Highland Hospital.  During the delivery, she experienced a vagina tear which required stitches.  After the birth, but before she received stitches, male sheriff's deputies, insisted that she had to be chained by the leg, to her hospital bed, even before she received any medical treatment.  This caused her severe pain and discomfort.

122.   After she received stitches, the deputies insisted that she had to be chained, spread eagle to the hospital bed, and forcibly chained Andanna.  She was allowed to see her baby, but not allowed to hold him.  She was told that the Sheriff and the County had policies forbidding her from holding or even touching her baby.  This caused her great emotional distress and she beame exceedingly distressed and distraught.

**Applicable Community Standards**

123.   SRJ's treatment of women prisoners falls far short of acceptable conditions under the United States Constitution. The Eighth Amendment to the U.S. Constitution requires that correctional facilities "must ensure that inmates receive adequate food, clothing, shelter, and medical

care." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)

124.   California Regulations provide a ready benchmark for what constitutes "adequate food, clothing, . . . and medical care."

125.   California Code of Regulations (hereinafter "CCR") § 1210(b) specifies that "[f]or each inmate treated for health conditions for which additional treatment, special accommodations and/or a schedule of follow-up care is/are needed during the period of incarceration, responsible health care staff shall develop a written treatment plan."

126.   CCR § 1248 specifies that, "The medical diets utilized by a facility shall be planned, prepared and served with consultation from a registered dietitian. The facility manager shall comply with any medical diet prescribed for an inmate.

127.   CCR § 1248 further specifies that, "[t]he facility manager and responsible physician shall ensure that the medical diet manual, which includes sample menus of medical diets, shall be available in both the medical unit and the food service office for reference and information. A registered dietitian shall review, and the responsible physician shall approve, the diet manual on an annual basis.

128.   CCR § 1248 further specifies that, "[p]regnant women shall be provided a balanced, nutritious diet approved by a doctor."

129.   CCR § 1240 specifies that, "[p]rovisions shall be made for inmates who may miss a regularly scheduled facility meal. They shall be provided with a substitute meal and beverage, and inmates on medical diets shall be provided with their prescribed meal."

130.   CCR § 1242 specifies that "Menus shall be planned to provide a variety of foods, thus preventing repetitive meals."

131.    CCR § 1241 specifies that "A wide variety of food should be served."

132.    CCR § 1241(b) specifies that "For . . . pregnant and lactating women, the requirement is four servings of milk or milk products" of 8 ozs. of liquid milk per day.

133.    CCR § 1241(c) specifies that "The daily requirement of fruits and vegetables shall be five servings. At least one serving shall be from each of the following three categories:

134.    CCR § 1241(c)(1) specifies that "One serving of a fresh fruit or vegetable per day, or seven (7) servings per week."

135.    CCR § 1241(c)(2) specifies that "One serving of a Vitamin C source containing 30 mg. or more per day or seven (7) servings per week."

136.    CCR § 1241(c)(3) specifies that "One serving of a Vitamin A source, fruit or vegetable, containing 200 micrograms Retional Equivalents (RE) or more per day, or seven servings per week."

137.    CCR § 1241 further specifies that "Providing only the minimum servings outlined in this regulation is not sufficient to meet the inmates' caloric requirements. Additional servings from the dairy, vegetable-fruit, and bread-cereal groups must be provided in amounts to meet caloric requirements."

138.    Further, CCR § 3050(a)(3) specifies that: "Pregnant inmates shall receive two extra eight ounce cartons of milk or a calcium supplement if lactose intolerant, two extra servings of fresh fruit, and two extra servings of fresh vegetables daily."

139.    CCR § 1230 specifies that, "[t]he responsible physician, in cooperation with the food services manager and the facility administrator, shall develop written procedures for medical screening of inmate food service workers prior to working in the facility kitchen"

140.   In addition, CCR § 1243 specifies that, "Facilities shall have a written food service plan that shall comply with the applicable California Retail Food Code."

141.   Among other things, the California  Retail Food Code § 113980 requires that "All food shall be manufactured, produced, prepared . . . stored . . . and served so as to be pure and free from . . . spoilage; . . . shall be protected from dirt, vermin, . . . droplet contamination, overhead leakage, or other environmental sources of contamination; shall otherwise be fully fit for human consumption."

142.   As alleged above in Paragraphs 89-118, ACSO and ARAMARK comply with none of the standards cited above which clearly define what constitutes the provision of adequate foods to inmates.

143.   CCR § 1260 specifies that, "The standard issue of climatically suitable clothing to inmates held after arraignment . . . shall include (c) clean undergarments . . . (2) for females - bra and two pairs of panties."  Further, CCR § 1262 specifies that, "Undergarments and socks shall be exchanged twice each week."

144.   CCR § 1248 also provides that "The inmates' personal undergarments and footwear may be substituted for the institutional undergarments and footwear specified in this regulation. This option notwithstanding, the facility has the primary responsibility to provide the personal undergarments and footwear."

145.   CCR § 1263 specifies that "Written policy and procedures shall specify handling of laundry that is known or suspected to be contaminated with infectious material."

146.   As alleged above in Paragraphs 71-88, ACSO complies with none of the standards cited above which clearly define what constitutes the provision of adequate foods to inmates.

147.    CCR § 1265 specifies that "Each female inmate shall be issued sanitary napkins and/or tampons as needed."  Further, California Penal Code § 3409(a) specifies that "Any incarcerated person in state prison who menstruates shall, upon request, have access to, and be allowed to use, materials necessary for personal hygiene with regard to their menstrual cycle and reproductive system."

148.    As alleged above in Paragraphs 41-45, ACSO complies with none of the standards cited above which clearly define what constitutes the provision of materials necessary for personal hygiene with regard to inmates' menstrual cycle and reproductive systems.

149.    Under CCR § 3355.2(b), all inmates with a confirmed pregnancy are entitled by California law to a treatment and care plan regimen.

150.    As alleged above in Paragraphs 89-118, ACSO and CFMG do not comply with standards clearly defined in CCR § 3355.2(b).  To the contrary, it is the policy, custom and practice of ACSO, carried out in concert with CFMG, to deny inmates with a confirmed pregnancy with access to such a treatment and care plan.  For example, and not by way of limitation, no plan of care is determined by an Obstetrical Physician or Obstetrical Nurse Practitioner, diagnostic studies are not ordered as needed, and obstetrics examinations are not scheduled in accordance with the schedule mandated by CCR § 3355.2(c).

151.    CCR § 3355.2(e) requires that pregnant women who are "receiving methadone treatment, shall be enrolled in the Methadone Maintenance Program and recommended for immediate transfer to the California Institution for Women."

152.    As alleged above in Paragraphs 94-97, ACSO and CFMG do not comply with standards clearly defined in CCR § 3355.2(e).  To the contrary, it is the policy, custom and practice of ACSO, carried out in concert with CFMG, to refuse to enroll such pregnant women in the

Methadone Maintenance Program or to recommend them for immediate transfer to the California Institution for Women.

153.   Women who have opiate addiction issues are denied medical care and thrust into the general population housing unit.  These women are forced to withdraw cold turkey, and this withdrawal frequently involves vomiting or loss of bowel or bladder control.  The housing units consist of 9 sets of bunk beds.  Pregnant women and women with disabilities are issued the bottom bunk.  Frequently these women withdrawing from opiates are placed on the top bunk, forcing pregnant women to be on the receiving end of vomit or other human secretions, and the terrible smell.  Given the short supply of clean linens, and cleaning supplies and equipment, pregnant women are forced to endure these coditions for hours at a time.

## FIRST CLAIM FOR RELIEF

## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AGAINST ACSO AND THE CALIFORNIA FORENSIC MEDICAL GROUP

154.  Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

155.   At all relevant times herein, Defendant CALIFORNIA FORENSIC MEDICAL GROUP acted under color of State law.

156.   At all relevant times herein, Defendant CFMG established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the Plaintiffs' and the class members' constitutional rights granted pursuant to 42 U.S.C. § 1983, including those under the Eighth and Fourteenth Amendments.  All of the aforementioned acts of the Defendant CFMG, their agents, servants and employees, were carried out jointly with ACSO under the color of state law.

157.   At all relevant times herein, Defendant ALAMDEA COUNTY SHERIFF'S OFFICE delegated to Defendant CFMG the traditional public function of determining and controlling the provision of medical services to women inmates, including pregnant inmates, in such a way as was deliberately calculated to deny such inmates access to adequate medical care.   The denial of necessary and appropriate medical services was imposed in order to reduce CFMG's costs under its contract with ASCO, specifically pursuant to the pricing provisions of that contract which penalized CFMG for allowing the provision of any outside medical care, regardless of the medical necessity of such care.

158.   At all relevant times herein, Defendant CFMG acted jointly and intentionally with Defendant ACSO, pursuant to a customary plan to restrict Plaintiffs and class members from obtaining medically necessary and appropriate medical care.

159.   At all relevant times herein, Defendant CFMG intentionally participated with the Defendant ACSO in a customary plan to restrict Plaintiffs and class members from obtaining medically necessary and appropriate medical care.

160.   At all relevant times herein, an inmate's right to necessary and appropriate medical services was clearly established.   The contours of the right to necessary and appropriate medical services was made sufficiently clear by, among other things, the California Regulations cited herein.

161.   At all relevant times herein, Defendants CFMG and ACSO acted with deliberate indifference to the violation of Plaintiff's class members' rights.   As shown above, CFMG and ACSO were aware of the substantial risk of serious harm to an inmate's health and safety created by the denial of necessary and appropriate medical services and CFMG and ACSO deliberately disregarded that risk.   At all relevant times, the California Regulations cited herein put CFMG and

ACSO on actual notice that such substantial risk of serious harm is not one that today's society chooses to tolerate.

162.  At all relevant times herein, there existed a pervasive entwinement between Defendant CFMG and Defendant ACSO, in that CFMG was at all relevant times delegated by ACSO the traditional public function of determining and providing medical care to inmates.

163.  The deprivation of Plaintiffs' and class members' constitutional rights was caused by the close nexus between Defendant CFMG and Defendant ACSO that was created by the direct role of Defendant ACSO in enforcing CFMG's determination to deny and withhold necessary and appropriate medical care to SRJ inmates.

164.  The close nexus between Defendants CFMG and ACSO is the legal cause of injuries to Plaintiffs and the class as alleged herein and, as a result, Plaintiffs and the class have sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

Wherefore, plaintiffs and the prisoner class they represent request relief as outlined below.

## SECOND CLAIM FOR RELIEF

## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AGAINST ACSO AND ARAMARK CORRECTIONAL SERVICES LLC

165.  Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

166.   At all relevant times herein, Defendant ARAMARK CORRECTIONAL SERVICES LLC acted under color of State law.

167.  At all relevant times herein, Defendant ARAMARK established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the Plaintiffs' and the class members' constitutional rights granted pursuant to 42 U.S.C. § 1983,

including those under the Eighth and Fourteenth Amendments.  All of the aforementioned acts of the Defendant ARAMARK, their agents, servants and employees, were carried out under the color of state law.

168.   At all relevant times herein, Defendant ALAMDEA COUNTY SHERIFF'S OFFICE delegated to Defendant ARAMARK the traditional public function of feeding municipal inmates and allowed and enabled Defendant ARAMARK to cause constitutionally inadequate food to be provided to SRJ inmates and to deny SRJ food that is adequate to sustain health.  The denial of food that is adequate to sustain health was imposed in order to reduce ARAMARK's costs under its contract with ASCO.

169.  At all relevant times herein, Defendant ARAMARK acted jointly and intentionally with Defendant ACSO, pursuant to a customary plan to prevent Plaintiffs and class members from having access to food that is adequate to maintain health.

170.   At all relevant times herein, Defendant ARAMARK intentionally participated with the Defendant ACSO in a customary plan to prevent Plaintiffs and class members from having access to food that is adequate to maintain health.

171.   At all relevant times herein, an inmate's right to food that is adequate to maintain health was clearly established.  The contours of the right to food that is adequate to maintain health was made sufficiently clear by, among other things, the California Regulations cited herein.

172.   At all relevant times herein, Defendants ARAMARK and ACSO acted with deliberate indifference to the violation of Plaintiff's class members' rights.  As shown above, ARAMARK and ACSO were aware of the substantial risk of serious harm to an inmate's health created by the denial of food that is adequate to maintain health and ARAMARK and ACSO deliberately disregarded that risk.  At all relevant times, the California Regulations cited herein put ARAMARK and ACSO on

1   actual notice that such substantial risk of serious harm is not one that today's society chooses to

2   tolerate.

3        173.  At all relevant times herein, there existed a pervasive entwinement between Defendant

4   CFMG and Defendant ACSO, in that ARAMARK was at all relevant times delegated by ACSO the

5   traditional State function of feeding inmates.

6        174.  The deprivation of Plaintiffs' and class members' constitutional rights was caused by

7

8   the close nexus between Defendant CFMG and Defendant ACSO that was created by the direct role

9   of Defendant ACSO in enforcing ARAMARK's determination to prevent Plaintiffs and class

10  members from having access to food that is adequate to sustain health.

11       175.  The close nexus between Defendants ARAMARK and ACSO is the legal cause of

12

13  injuries to Plaintiffs and the class as alleged herein and, as a result, Plaintiffs and the class have

14  sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses,

15  including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at

16  trial.

17       WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

18

19

20                              **THIRD CLAIM FOR RELIEF**

21                        **DEPRIVATION OF FEDERAL CIVIL RIGHTS**

22                        **UNDER 42 U.S.C. § 1983 AGAINST ACSO**

23

24       176.  Plaintiffs repeat and re-allege each and every allegation contained in the above

25  paragraphs with the same force and effect as if fully set forth herein.

26       177.  At all relevant times herein, ACSO has been responsible for operating the Santa Rita

27  Jail.

28

178. At all relevant times herein, Defendant ACSO has established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the Plaintiffs' and the class members' constitutional rights granted pursuant to 42 U.S.C. § 1983, including those under the First, Fourth, Eighth and Fourteenth Amendments.

179. At all relevant times herein, ACSO has followed a custom, policy and practice of imposing greater restrictions and other hardships on women prisoners at SRJ than on male prisoners, with no valid penological purpose. By way of example only, these greater restrictions and hardships include, but are not limited to, restrictions on the right to speak at meal times; the right to have access to laundry and undergarments that meet minimum community standards; the right of access to materials necessary for personal hygiene with regard to their menstrual cycle and reproductive system; and the right to be free of infliction of frequent and repeated strip and body cavity searches that are conducted outside prisoners' cells, for no valid penological reason, and as retaliation for and as a deterrent to the filing of inmate grievances.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

## FOURTH CLAIM FOR RELIEF

## DEPRIVATION OF RIGHTS

### Under Article I, Section 7 of the California Constitution Against All Defendants

180. Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

181. By their policies and practices described above, Defendants subjected Plaintiffs and the Class they represent, to a substantial risk of harm and injury from inadequate medical care, insufficient nourishment to maintain life, and abuse treatment and hardships. These policies and

practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Class's ongoing deprivation of rights secured by the California Constitution, Article I, Section 17.

182.   Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

### FIFTH CLAIM FOR RELIEF

#### Bane Act

(Cal. Civ. Code § 52.1(b); Cal. Gov. Code §§ 815.2(a) & 820(a))

183.   Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

184.   Defendants' DEPUTY DIVINE (#512), DEPUTY DEBRA FARMANIAN, DEPUTY WEATHERBEE (#238), DEPUTY TANIA POPE, DEPUTY WINSTEAD, DEPUTY CAINE and John and Jane Does 1- 50, employed as deputies in Santa Rita Jail, acting or purporting to act in the performance of his or her official duties as a Sheriff's deputy,  engaged in the above-described conduct, including threatening and actually imposing punishments including solitary confinement, deprivation of food and privileges, and searches and shakedowns constituted interference, and attempted interference, by threats, intimidation and coercion, with plaintiffs' peaceable exercise and enjoyment of rights secured by the Constitution and laws of the United States and the State of California, in violation of California Civil Code §52.1.

185.   Defendants County of Alameda, Alameda County Sheriff's Office, Gregory Ahern, BRETT M. KETELES, TOM MADIGAN, T. POPE, T. RUSSELL, Does 1-50, acting under color of state law and as policy-making authorities, maintained policies, customs, or practices permitting or deliberately indifferent to, or failed to maintain policies, customs, or practices when it was obvious that they were needed to prevent the conduct of sheriff deputies and guards violations of plaintiffs and class members First, Fourth, Fifth, Eighth and Fourteen Amendment rights protected

by the U.S. Constitution and art. I, § 7 of the California Constitution, and were the moving force, by threats, intimidation or coercion, behind the jail guards and sheriff's deputies violation of plaintiff's rights protected by the U.S. Constitution and art. I, § 7 of the California Constitution.

186.   71. Defendants COUNTY OF ALAMEDA and ALAMEDA COUNTY SHERIFF'S OFFICE are indirectly and vicariously liable, through the principles of respondeat superior, for injuries proximately caused by acts or omissions of their employees acting within the scope of their employment.

187.   As a direct and proximate result of the wrongful conduct by Defendants ALAMEDA COUNTY SHERIFF'S OFFICE, GREGORY J. AHERN, BRETT M. KETELES, TOM MADIGAN, T. POPE, T. RUSSELL, D. SKOLDQVIST, LT. HATTAWAY, SGT. CALAGARI, DEPUTY DIVINE (#512), DEPUTY DEBRA FARMANIAN, DEPUTY WEATHERBEE (#238), DEPUTY TANIA POPE, DEPUTY WINSTEAD, DEPUTY CAINE, ALAMEDA COUNTY and John & Jane DOEs, Nos. 1 – 50 actions and inactions, Plaintiffs suffered injuries entitling them to receive compensatory damages against said defendants, declaratory and injunctive relief against Defendants Alameda County, Alameda County Sheriff's Office and Gregory J. Ahern.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.


### SIXTH CLAIM FOR RELIEF

### Negligence

### Cal Gov. Code §815.2(a) & 820(a).

188.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 186 of this Complaint, to the extent relevant, as if fully set forth in this Claim.

189.    Defendants DIVINE (#512), DEBRA FARMANIAN, WEATHERBEE (#238), DEPUTY TANIA POPE, WINSTEAD, CAINE, T. POPE, acting or purporting to act in the performance of official duties  have a duty of care to plaintiffs and class members to ensure that defendants did not cause unnecessary or unjustified harm to plaintiffs, including reasonable conduct and decisions on the use and application of punishment including solitary confinement, and searches, actions which constituted punishment or retaliation for a prisoner's attempt to grieve or

complain about conditions and treatment; or against any female prisoner for vocalizing a need for sanitation or feminine hygiene products.

190.    Defendants ALAMEDA COUNTY SHERIFF'S OFFICE AND ALAMEDA COUNTY, GREGORY J. AHERN, BRETT M. KETELES, TOM MADIGAN, T. RUSSELL, D. SKOLDQVIST, LT. HATTAWAY, SGT. CALAGARI acting under color of state law and as policy making authorities, owed plaintiffs a duty of care to hire, train, supervise and discipline Jail employees so as to not cause harm to plaintiff and class members and to prevent violations of their constitutional, statutory and common law rights.

191.    Defendants ALAMEDA COUNTY SHERIFFS OFFICE and ALAMEDA COUNTY are indirectly and vicariously liable, through the principles of respondeat superior, for injuries proximately caused by acts or omissions for their employees acting within the scope of their employment.

192.    As a proximately and direct result of Defendants ALAMEDA COUNTY SHERIFFS OFFICE and ALAMEDA COUNTY, GREGORY AHERN, BRETT M. KETELES, TOM MADIGAN, T. RUSSELL, D. SKOLDQVIST, LT. HATTAWAY, SGT. CALAGARI DEBRA FARMANIAN, WEATHERBEE (#238), DEPUTY TANIA POPE, WINSTEAD, CAINE, T. POPE, AND DOE 1-50'S actions and inactions, plaintiffs suffered injuries entitling them to receive compensatory damages against these defendants.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the Court to:

1. Certify the Class of women prisoners at Santa Rita under Rule 23, F.R. Civ P., and also the Subclass of women prisoners who are pregnant, and permit the named plaintiffs and their counsel to represent the Class and Subclass and to proceed accordingly. Under the alternative, hold certification of the broad class in abeyance pending further development of the grounds

for it, but recognize the Subclass for all purposes connected with its plea(s) for equitable relief herein.

2. Make findings of fact reflecting the general and specific failings and inadequacies of both groups of defendants' approaches to and practice in the care of pregnant prisoners, the pattern and practice of defendants' non-feasance and maltreatment of pregnant prisoners, and defendants' violations of statutory, regulatory and constitutional requirements in dealing with pregnant prisoners.

3. Initiate a serious effort, perhaps with a Rule to Show Cause, to bring about defendants' early compliance with the community treatment program law Penal Code §1170., and/or any other feasible and available means and steps to get and keep pregnant women out of the Santa Rita jail.

4. In the event a ready process for getting and keeping plaintiffs out of the jail is not readily found, and to the extent and for the time any pregnant women are ordered held in the Sheriff's custody, enter a preliminary and permanent Injunction which will,

A. **Prohibit defendants from**:

a. coercion or pressure on pregnant prisoners to consent to a preterm termination of their pregnancy;

b. placing pregnant prisoners in solitary confinement, and/or ordering them to submit to multiple strip searches and body cavity searches without first utilizing less punitive and intrusive means including urine tests and having objectively reasonable grounds to suspect them of hiding contraband;

c. placing pregnant prisoners outdoors without adequate outerwear, and clothing;

d. holding pregnant prisoners outdoors against their will for any length of time, or keeping the heat down in residential units, and the bright lights on all night;

e. punishing or threatening to punish women prisoners for exercising their right to free speech during meals or during 'pod time';

f. touching or searching plaintiff's food unless defendants' hands are covered in clean, and new sanitary gloves;

g. coerce or pressure or attempt to persuade pregnant prisoners to agree to abortions;

h. intervening or interfering with attorney client communications

**And**,

B. **Affirmatively <u>Order and direct</u> defendants to**:

a. Fully comply with all applicable state statutes and regulations, and develop a legitimate individual treatment plan for each pregnant prisoner, *and carry it out completely*!

b. Fully comply with all applicable state statutes and regulations for a sufficient, balanced, nutritious diet approved by a doctor;

c. Fully comply with state law on provision of appropriate and sufficient materials for each woman prisoner "necessary for (1) personal hygiene with regard to her menstrual cycle and reproductive system" (Penal Code §3409) during the entire duration of her incarceration under the custody of defendants;

d. No less than the minimum outdoor exercise prescribed by state regulations;

e. Permit confidential legal contact visits between plaintiffs, class members and their attorneys;

5. Enter a preliminary and permanent injunction on behalf of the broad Class of women prisoners which will counter and remedy the County defendants' broader unconstitutional

practice(s) of discrimination against women in general, compared to men, as complained of and to be shown further;

6. Award compensatory and punitive damages to individual plaintiffs against defendants in amounts to be determined at trial;

7. Award costs and fees for this action, including attorneys' fees;

8. Grant such other and further relief as this Court deems appropriate.

## JURY TRIAL DEMAND

A JURY TRIAL IS DEMANDED on behalf of Plaintiffs.

DATED:      May 4, 2018                    **LAW OFFICE OF YOLANDA HUANG**


  */s/ Yolanda Huang*_____

Yolanda Huang



**DENNIS CUNNINGHAM**


 _/s/ Dennis Cunningham_____

Dennis Cunningham



*Counsel for Plaintiffs*