LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543
475 14th Street, Suite 500
Oakland, CA 94612
Telephone: (510) 329-2140
Facsimile:  (510) 580-9410

DENNIS CUNNINGHAM, SBN 112910
115A Bartlett St.
San Francisco, CA 94110
Telephone: 415-285-8091
Facsimile: 415-285-8092

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| JACLYN MOHRBACHER, ERIN ELLIS, DOMINIQUE JACKSON, CHRISTINA ZEPEDA, ALEXIS WAH, AND KELSEY ERWIN, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ALAMEDA COUNTY SHERIFF'S OFFICE, et al.,<br>Defendants. | No. 3:18-cv-00050-JD<br><br>**PLAINTIFFS' PROPOSAL TO TERMINATE MEDIATION AND FOR CONSOLIDATION WITH UPSHAW et al. vs. ALAMEDA COUNTY** 3:18-cv-07814-JD |
| TIKISHA UPSHAW, TYREKA STEWART and ANDREA HERNANDEZ,  on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br>ALAMEDA COUNTY; ALAMEDA COUNTY SHERIFF'S OFFICE; et al.,<br>Defendants. | Case No. 3:18-cv-07814-JD |

TO THE COURT, ALL DEFENDANTS AND THEIR COUNSELS OF RECORD:

1

1

PLEASE TAKE NOTICE:

2

Pursuant to the Court's invitation on 2/28/19, plaintiffs by counsel —hereby propose to

3

end the mediation process, after a year with no results, and come back in front of the Court.  Then,

4

with its leave, we would ask the Court to consolidate the *UPSHAW et al. vs. ALAMEDA*

5

*COUNTY, et al.* 3:18-cv-07814-JD (herein after the "Sleep case") with the main case

6

*MOHRBACHER, ET AL. V. ALAMEDA COUNTY SHERIFF'S OFFICE*, *et al.* 3:18-cv-00050-JD,

7

(hereinafter the "Main case"), and give us 20-30 days to submit an amended, omnibus complaint,

8

charging systemic, endemic, categorically  unconstitutional maltreatment of women at Santa Rita

9

Jail—especially including pregnant women, and in violation of rights of those unborn—

10

encompassing all the particulars of apparent ongoing constitutional wrongdoing, under both 8th

11

and 14th Amendments, including other emergent claims, which we have detected in a year of

detailed communications with women in and out of Santa Rita.[1]

12

We will be seeking intervention by the Court in the form of specific directions for reform,

13

and change, prohibitions on various wrong actions, and setting standards, all based on findings

14

across a broad front of particular claims.

15

A working but unrefined outline of these Claims or categories of claims, could be as

follows:

16

1.  Constantly Bad, Insufficient, non-nourishing Food (especially for pregnant women);

17

after earnest promises; for example live, wriggling maggots in the beans, one night about  two

18

weeks ago, on five trays randomly chosen by the deputy.[2]

19

2.  Bad Medical Care; poorly trained, incompetent, careless, indifferent personnel, and

20

defective equipment; poor and dangerously inaccurate record-keeping and medicine scans;

21

wretched mistreatment of women in drug withdrawal; and more; the onerous $3.00 fee to submit,

22

simply submit, a request to see a medical person remains, despite defendants' promise way last

23

Spring, and menstrual pads are still in constant short supply, etc;

24

---

[1]   This has been mainly accomplished and recorded by our invaluable Investigator, Carey

25

Lamprecht, a certified paralegal, who is a true and accurate repository and source of good
information about daily life and events in the Women's section of Santa Rita Jail from early Spring,

26

2018 to now.  Such investigation necessitated by the lack and failure of defendants to provide
accurate data and information about the workings of the  jail.

27

[2] This shocking episode is recounted for its shock value, without a doubt; because it illustrates the
degree of abandon, and, objectively, wantonness, as it were, with which the women are treated in this

28

jail.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3.  A Corrupted, disrupted grievance process, wherein forms are withheld or disappeared by hostile deputies after submission, and complaints which do make it through are invariably whitewashed, and offending deputies never held accountable;

4.  A Corrupted disciplinary process; frequent illicit group punishments, etc, and no clear written rules, but mostly made-up on the spot, ongoing denial of (useless) handbooks, random summary punishment by unreasonable and humiliating strip and 'squat and cough' searches, and undue denial of yard, classes and mail; more;

5. Maladministration in so many ways: prolonged, unjustified, punitive confinement to cells; the limited "POD" (out–of–cell) time then often scheduled at 6:00 am, then cut off early; access to phones limited to these early hour POD times when lawyers, etc. cannot be reached, 3 a.m. pill call and much-too-early wake-up times (as we saw); reclassification as punishment; great over-use of shackling; a gross ITR room where women must wait hours for "processing" when returning from Court, and pregnant ones get no priority, etc, etc, etc.  Women required to maintain cell cleanliness but provided only Cleaning times and supplies have not improved, etc, etc.  These defendants are deep dug in;

6.  Failure to properly screen, train, supervise and discipline line officers to counter and block abusive tendencies; indulgence of misconduct, and 'mean deputies' whose tyrannies—in what has been called an "operational disconnect", whereby the commanders have no 'situational awareness' of how officers on the line behaving---and other warning signs are ignored.  The mean deputies are at the heart of the problem here, along with obtuse, prejudiced administrative policy & practice. Examples are replete including the regular discard of the few, but important personal possession these women have, including family photos, cards from children, and in one instance, a woman's ring, the last memento from her deceased father;

7. Unspoken Policy of constant, deliberate, unjustifiably punitive and abusive infliction of fear, guilt, shaming, discomfort, neglect, misery and suffering, all unjustified, and gratuitous and laced with malice, by officers in charge of daily life; and,

8.  An ongoing factual dispute wherein defendants deny these wrongdoings, particularly claims that guards are mean and nasty with repeated assertions that the guards have families and love their children, to which plaintiffs respond with the research and findings of Phillip Zimbardo, author

**PLAINTIFFS' PROPOSAL TO TERMINATE MEDIATION AND CONSOLIDATE CASES**
*Mohrbacher v. Alameda County Sheriff's Office* ,United States District Court, Northern District of California, Case No. 3:18-cv-00050 JD

and master of the Stanford Prison Experiment who documented that "[t]here were no bad apples in the barrel, it was the barrel itself that created evil." [3]

Further, we ask the Court:

1.  To make specific orders for Defendants to halt the night time sleep disruption at Santa Rita Jail;

We will be asking the Court:

2.  To consider making specific orders, after hearings, on acute specific problems (such as spoiled food, inadequate nutrition for pregnant women); or in the alternative,

3.  To consider initiating specific inquiries with an eye to developing both a record of things that have happened, and evidence of the violations alleged, and disposition of specific issues; and,

4.  Class Certification - to make short work of the decision to certify the class of these women, booked into SRJ (and out, for some relevant period after), and a subclass of those who are pregnant—where we will also be asserting a second sub-class, of addicted women, who go into withdrawal in custody, and are all too often treated punitively and inadequately, and with callous and deliberate indifference, if not outright cruelty under an 8th Amendment standard.

5.  To make specific provisions for ample, effective access to the Women for counsel— well beyond the current apparently baseless restrictions on access which defendants enforce [4], let alone the types of harassment, resistance, and delay we meet so often—to and including prohibiting counsels from meeting with more than one prisoner at a time.  The bar on group meetings denies opportunities for the women to discuss, understand and reach agreement(s) about the case, and for development of live, current evidence of the ongoing tyrannies plaintiffs suffer under as complained of herein.

6.

---

[3] Zimbardo, Philip G. Open Forum, 05/17/2004, Attached as Exhibit A.
[4] Each housing unit in Santa Rita Jail has only one (1) attorney interview room. which quickly fill up. Further SRJ limits attorney visits to 56 hours permitted out of 168 hours in a week, and of those 56 hours, only 28 fall within tradition work times.

4

**PLAINTIFFS' PROPOSAL TO TERMINATE MEDIATION AND CONSOLIDATE CASES**
*Mohrbacher v. Alameda County Sheriff's Office ,United States District Court, Northern District of California, Case No. 3:18-cv-00050 JD*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In Conclusion, we believe there is good law on the issues and facts at hand.   We look forward to digging in on all these issues.

Dated: March 14, 2019                          ATTORNEYS FOR PLAINTIFFS

LAW OFFICE OF YOLANDA HUANG

By:___*/s/ Yolanda Huang*_____
                    YOLANDA HUANG

DENNIS CUNNINGHAM

By:___*/s/ Dennis Cunningham*___

**PLAINTIFFS' PROPOSAL TO TERMINATE MEDIATION AND CONSOLIDATE CASES**
*Mohrbacher v. Alameda County Sheriff's Office* ,United States District Court, Northern District of California, Case No. 3:18-cv-00050 JD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

**PLAINTIFFS' PROPOSAL TO TERMINATE MEDIATION AND CONSOLIDATE CASES**
*Mohrbacher v. Alameda County Sheriff's Office* ,United States District Court, Northern District of California, Case No. 3:18-cv-00050 JD

OPINION

**OPEN FORUM** | *Moral Conscience and the War in Iraq*

5/11/04

# The virtue of action

By Philip G. Zimbardo

*"The only thing necessary for the triumph of evil is for good men to do nothing."*

— EDMUND BURKE

The horrifying images of American soldiers brutalizing Iraqi prisoners must raise three important questions for me as a social psychologist: First, can I understand the conditions under which these men and women were working for the last six months that could have transformed them from good Dr. Jekylls to sadistic Mr. Hydes?; second, would I be equally vulnerable to the situational forces that led them to such cruelty?; and third, had I been a witness to the terrible events inside Abu Ghraib prison, would I have intervened and blown the whistle?



ANJA NIEDRINGHAUS / Associated Press

**On guard:** A soldier stands outside the cells at Iraq's Abu Ghraib prison early this month. Abuses of Iraqi prisoners at the jail have prompted investigations into how such illegal acts occur.

...gations into how such illegal acts occur.

A psychological perspective upon evil focuses on human behavior that demeans, harms or destroys other human beings, or causes others to do so. By this definition the military police reservists, who were to have maintained law and order and to treat prisoners with the same dignity and humanity they would expect to receive in their place, are guilty of committing evil.

The same reasoning, however, would condemn the "guards" I supervised in the Stanford Prison Experiment I conducted more than 30 years ago. The subjects in this experiment were normal, intelligent, psychologically healthy college student volunteers who were randomly assigned to play the role of guards in a simulated prison environment in relation to their peers assigned to play the role of prisoners. Within days the "guards" assaulted the "prisoners," stripped them naked, hooded them, chained them, deprived them of sleep, locked them in the solitary confinement of a closet for hours and finally began to practice sexually degrading "games" on their victims. The study was scheduled to run for two weeks; I had to terminate it in five days.

Intelligent, morally upright young men had been transformed by the prison setting into unfeeling, cruel, even sadistic prison guards. Normal, intelligent young men, who had been assigned to be prisoners by the fickle toss of a coin, suffered emotional breakdowns in their powerless, helpless state as prisoners. The dynamic catalyst for these remarkable changes was the prison environment. There were no bad apples in the barrel; it was the barrel itself that created evil.

The social and psychological factors at play in the Stanford Prison Experiment correspond almost exactly with those at play in the Iraqi prison. The dominant factors in both the real and the simulated prison were several:

▶ extreme power differentials;

▶ the diffusion of responsibility for immoral deeds and the sense of anonymity that freed the guards from any awareness of personal responsibility for their actions;

▶ the dehumanization of the "other";

▶ the behavioral norms set by the group;

▶ the absence of enforced sanctions upon unacceptable behavior;

▶ the individual guards who model abusive behavior for peers; and

▶ a narrowing of time perspective that trapped both guards and prisoners in an expanded "present."

Also at work in the Iraqi situation were the cloak of secrecy, the absence of a standard of social acceptability, the inadequate training of the guards and the encouragement of CIA and contract interrogators to "break the will" of detainees.

The only question in this recipe for disaster was not whether, but when chaos would erupt. It is evident from the expressions on the faces of the soldiers that they were oblivious to the moral significance as well as to the consequences of their actions. They were trapped in a moment out of ordinary time immersed in hedonistic mindlessness.

In their place would I have committed the same crimes? I would, of course, like to think that I would not, could not. But having conducted the Stanford Prison Experiment, I know better. Judgment is easy from a distance when one is comfortably surrounded by the social structures and props that provide us with controls, with a sense of certainty and predictability. But in a totally alien setting where the unusual becomes normative and the self is free from all the checks of traditional morality and future reality, what then?

Dozens of psychological studies that my colleagues and I have conducted reveal that the majority of decent, ordinary people can be easily seduced into crossing the line into perpetrating evil, for the line between good and evil is not an abstract design in cyberspace but lies in the cauldron of the human heart.

I wonder whether I would be able to sound the alarm when my countrymen were violating their allegiance to country and humanity. Pressures to conform are enormous: Be a team player! Don't rock the boat! You'll be crushed if you dare to buck the system! I'm just a little guy; they have all the clout!

It was one young Ph.D., Cristina Maslach, who forced me to close down that awful Stanford prison I had constructed by telling me that *I was responsible for the horrors she saw.* It took one small voice to challenge my authority and bring the system down.

In Abu Ghraib there are such heroes, and we should honor them: William Kimbro, a dog handler who refused to allow his dogs to attack prisoners despite the inducements offered him; David Sutton, who tried to stop the abuses he was witnessing by reporting it to the officers above him in the chain of command; and Joe Darby, average G.I. Joe, who brought visual images of the horrors to the light of day because he would not permit inhumanity to hide itself.

We need to more fully investigate the psychology of resisters. All of us should honor and laud the heroic few. We should hold them up for models of rectitude for our children to emulate. We should be proud to have such countrymen and women.

*"Throughout history, it has been the inaction of those who could have acted; the indifference of those who should have known better; the silence of the voice of justice when it mattered most that has made it possible for evil to triumph."*

—HAILE SELASSIE, *emperor of Ethiopia, 1892-1975*

*Philip G. Zimbardo is emeritus professor of psychology at Stanford University. Information about the Stanford Prison Experiment can be found online at www.prisonexperiment.org.*