1

LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543

2

475 14th Street, Suite 500

3

Oakland, CA 94612
Telephone: (510) 329-2140

4

Facsimile:  (510) 580-9410

5

DENNIS CUNNINGHAM, SBN 112910

6

115A Bartlett St.
San Francisco, CA 94110

7

Telephone: 415-285-8091
Facsimile:  415-285-8092

8

Attorneys for Plaintiffs

9

10

IN THE UNITED STATES DISTRICT COURT

11

FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13

**ALAMEDA COUNTY MEN PRISONERS**
And Former Prisoners DWIGHT ADAMS,

No. 3:18-cv-00050-JD

14

CEDRIC HENRY, DARRYL GEYER, And

15

JOHN DOEs Nos. 1-- X, on behalf of themselves
and others similarly situated, <u>as a Class, and</u>

16

<u>Subclass</u>

17

**PLAINTIFFS,**

**THIRD AMENDED COMPLAINT** for

18

vs.

INJUNCTIVE RELIEF AND

19

**ALAMEDA COUNTY SHERIFF'S OFFICE**,
GREGORY J. AHERN, BRETT M. KETELES,

DAMAGES

20

TOM MADIGAN, T. POPE, T. RUSSELL, D.
SKOLDQVIST, LT. HATTAWAY, SGT.

FOR VIOLATION OF CIVIL RIGHTS

21

CALAGARI, DEPUTY DIVINE (#512),

and OTHER WRONGS

22

DEPUTY DEBRA FARMANIAN, DEPUTY
WEATHERBEE (#238), DEPUTY TANIA

23

POPE, DEPUTY WINSTEAD, DEPUTY

24

CAINE, ALAMEDA COUNTY and John & Jane
DOEs, Nos. 1 - 50.

25

**and,**

**JURY TRIAL DEMANDED**

**The CALIFORNIA FORENSIC MEDICAL**

26

**GROUP**, a corporation; its Employees and Sub-
Contractors, and Rick & Ruth ROEs Nos. 1-50,

27

**and,**
**ARAMARK CORRECTIONAL SERVICES,**

28

**LLC**, a Delaware Limited Liability Company; its

1
2
3

Employees and Sub-Contractors, and Rick and
Ruth ROES Nos. Nos. 1-50,

**DEFENDANTS.**

4
5
6
7
8
9
10
11
12
13
14

Even in jail, women are second class citizens.  Plaintiffs JACLYN MOHRBACHER, ERIN ELLIS, and DOMINIQUE JACKSON, now joined by others named within, on behalf of themselves and those they speak for and seek to represent herein---along with those others now named and to be named individually as plaintiffs---for themselves and others, pursuant to the Court's discussion with Counsel at the status call on February 4, 2021, wherein the Court stated the Court will handle all "gender specific allegations for female inmates."  (ECF 184)  The allegations in the complaint are based on the knowledge of the Plaintiffs as to themselves and as to conditions and acts which they have personally observed, and on information and belief, including the investigation of counsel, as to all other matters.

15

## PRELIMINARY STATEMENT

16
17
18
19

1.     This is a civil rights action in which the Plaintiffs, on behalf of themselves and a class of similarly situated female prisoners incarcerated in Santa Rita Jail, seek relief for Defendants' violations of Plaintiffs' rights and privileges secured by the First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution.

20
21
22
23
24
25

2.     Defendant ALAMEDA COUNTY SHERIFF'S OFFICE ("Sheriff") has implemented and enforced, and without the Court's intervention will continue to implement and enforce, a policy, practice, and/or custom of a multitude of policies and practices which discriminate against plaintiffs and those they seek to represent women, based upon their gender, in violation of the Fourteenth Amendment of the United States Constitution, and Article 1, Section 7 of the California Constitution.

26
27
28

3.     Without the Court's intervention, the Defendants in this action will continue to deny women prisoners at Santa Rita Jail, the same access as male prisoners to laundry, access and opportunities to exercise, access and opportunities for classes and programs, the same opportunities

as male prisoners for out of cell time, and the necessary protection against sexual harassment in violation of the Eighth Amendment, Fourteenth Amendment and Article 1, §§7 and 17 of the California Constitution.

4.     Defendants WELLPATH (formerly CALIFORNIA FORENSIC MEDICAL GROUP "WELLPATH/CFMG") and the ALAMEDA COUNTY SHERIFF'S OFFICE ("Sheriff") have implemented and enforced, and without the Court's intervention will continue to implement and enforce, a policy, practice, and/or custom of denying pregnant women prisoners at Santa Rita Jail necessary and appropriate medical care, in violation of the Eighth Amendment, Fourteenth Amendment and Article 1, §§7 and 17 of the California Constitution.

5.     Defendants ARAMARK CORRECTIONAL SERVICES, LLC and the ALAMEDA COUNTY SHERIFF'S OFFICE have implemented and enforced, and without the Court's intervention will continue to implement and enforce, a policy, practice, and/or custom of denying pregnant women prisoners at Santa Rita Jail food that is adequate to maintain health in violation of the Fourteenth and Eighth Amendment and Article 1, §§7 and 17 of the California Constitution.

6.     This action seeks to end the barbaric conditions at SRJ regarding medical care and food.  These practices result in almost universal and inevitable miscarriages suffered by women who enter SRJ while pregnant.  These practices include coercion by ACSO and WELLPATH/CFMG staff to force inmates to have abortions.  These practices include the denial of materials necessary for personal hygiene with regard to inmates' menstrual cycle and reproductive systems.  The practices complained of herein are cruel and inhumane and violate the  most minimal standards of decency of a civilized society.

7.     Plaintiffs bring this action for injunctive relief, and for monetary damages, individually and on behalf of all others similarly situated who have been and will be incarcerated at Santa Rita Jail, and to redress all Defendants' violations of their rights under the First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution, and Article 1, §§7 and 17 of the California Constitution.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURISDICTION

8.      This action is brought pursuant to the Eighth, and Fourteenth Amendments to the United State Constitution, by way of the Civil Rights Acts, 42 U.S.C. §§1981, 1983 et seq. and 1988.

9.      Jurisdiction is conferred upon this Court by 28 U.S.C. §1331 (claims arising under the United States Constitution) and §1343 (claims brought to address deprivations, under color of state authority, of rights privileges, and immunities secured by the United States Constitution), and, by pendent jurisdiction, Secs. 52.1, and 50, of the California Civil Code and the aforementioned statutory and constitutional provisions.   Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. 1343, 2201, 2202 and 42 U.S.C. §1983.

Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action, including under Article 1, Sections 7 and 17 of the California Constitution.

## VENUE AND INTRADISTRICT ASSIGNMENT

10.     The claims alleged herein arose in the County of Alameda, State of California. Therefore, venue and assignment, under 28 U.S.C. § 1391(b), lies in the United States District Court for the Northern District of California, San Francisco Division or Oakland Division.

## PARTIES

## PLAINTIFFS

11.     Plaintiffs are all former and current female prisoners incarcerated at the Santa Rita Jail.  All Plaintiffs seek to represent a class of female imprisoned at the Santa Rita Jail from 2017 through to the present.

12.     Plaintiffs JACLYN MOHRBACHER, JAZZMIN BARBOZA, LEANNA ZAMORA, DOMONIQUE SWAIN, TIKISHA UPSHAW, FRANKIE PORCHER, SYDNEY WHALEN,

DAYNA ALEXANDER, GABRIELA DEFRANCO are women who are currently imprisoned at Santa Rita jail.

13.     Plaintiffs MARCAYSHA ALEXANDER, ANDANNA IBE, ANDRANIA YANCY, SANDRA GRIFFIN, DIAMOND COOPER, MARY MAPA, ROSE PEREZ, ANNETTE KOZLOWSKI , DENISE ROHRBACH, ALEXIS WAH, KELSEY ERWIN, SHANI JONES, DAWN DEDRICK, JAMILA LONGMIRE, NATALIE GARRIDO, JAZMINE TATE, MONICA NUNES, MARTINA GOMEZ, ERIN ELLIS, DOMINIQUE JACKSON,  were but at present, are not, incarcerated prisoners in Santa Rita Jail.

14.     JACLYN MOHRBACHER and CHRISTINA ZEPEDA are formerly pregnant prisoners who suffered a miscarriage due to the mistreatment received at the hands of defendants, while under the custody and control of the Alameda County Sheriff's Office.  Plaintiffs MOHRBACHER and ZEPEDA seek to represent a Subclass of pregnant Santa Rita Jail prisoners.

15.     Plaintiff JAIME JOHNSTON was a pregnant prisoner under the custody and control of the Alameda County Sheriff's office.  Plaintiff JAIME JOHNSTON wished to carry her pregnancy to term and to deliver and have a healthy baby, and accordingly wants and demands no less than the minimum necessary nutrition, medical and other support which that requires and to which they are entitled by the U.S. Constitution.  Along with Plaintiffs MOHRBACHER and ZEPEDA, Plaintiffs  ELLIS, JACKSON, and JOHNSTON also seek to represent a Subclass of pregnant Santa Rita Jail prisoners.

16.     Eighty-five percent of all prisoners in Santa Rita Jail are pretrial detainees.

## DEFENDANTS

### Alameda County Defendants

17.     Defendant ALAMEDA COUNTY SHERIFF'S OFFICE ("ACSO") is a "public entity" within the definition of Cal. Govt. Code § 811.2.

18.     Defendant GREGORY J. AHERN is, and at all times relevant to this Complaint was, the Sheriff of Alameda County.  As Sheriff of Alameda County, Defendant Ahern has at times relevant to this Complaint held a command and policy making position with regard to County Jails,

including Santa Rita Jail.  Defendant Sheriff AHERN has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at Santa Rita Jail, as described fully below.  Sherriff AHERN has, wholly or in part, directly and proximately caused and, in the absence of the injunctive relief which Plaintiffs seek in this Complaint, will continue in the future to proximately cause, the injuries and violations of rights set forth fully below. Defendant Sheriff AHERN is sued in his official capacity only.

19.    Each and every Defendant named herein was at all times relevant to this Complaint an officer or employee of the Alameda County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of ASCO and within the scope of their employment with ASCO.

## The Private Contractor Defendants

20.    Defendant WELL-PATH MANAGEMENT, INC  (hereinafter referred to as "WELL-PATH") is an active, for-profit corporation incorporated in the State of Delaware with its principal place of business in California, located at San Diego, California.   Previously, defendant WELL-PATH was defendant CALIFORNIA FORENSIC MEDICAL CORPORATION ("WELLPATH/CFMG").  Defendant WELL-PATH and its predecessor defendant CFMG had entered into written contracts with defendant SHERIFF to provide and is currently engaged in providing general medical, dental, prenatal and opioid treatment services at Santa Rita Jail. Defendants RICK and RUTH ROEs 1-50 are WELL-PATH employees who work at Santa Rita Jail. At all times relevant to this Complaint, Defendants WELL-PATH and RICK and RUTH ROEs 1-25 were agents of the Alameda County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of ASCO and within the scope of their agency with ASCO.

21.    Defendant ARAMARK CORRECTIONAL SERVICES LLC ("ARAMARK") is an active, foreign, for-profit Limited Liability Company registered in the State of Delaware and licensed to do business in the State of California.  Defendant ARAMARK contracts with ASCO to operate the kitchens at Santa Rita Jail for the purpose of feeding Santa Rita prisoners.  Defendants

RICK and RUTH ROEs 51-100 are ARAMARK employees who work at Santa Rita Jail.  At all times relevant to this Complaint, Defendants ARAMARK and RICK and RUTH ROEs 51-100 were agents of the Alameda County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of ASCO and within the scope of their agency with ASCO.

22.     Plaintiffs are ignorant of the true names and capacities of defendants sued in this complaint as ROES and DOES 1 through 50, inclusive and therefore sue these defendants by such fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in this complaint.

23.     At all times mentioned in this complaint, each Defendant was the agent of the others, was acting within the course and scope of this agency, and all acts alleged to have been committed by any one of them was committed on behalf of every other Defendant.

## CLASS ALLEGATIONS

24.     Pursuant to Rules 23(a), (b2) and (b)(3) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a Plaintiff class consisting of all women incarcerated at Santa Rita Jail ("SRJ")from January 8, 2016 to the present, or will be in the future.  All women inmates were discriminated against on the basis of their sex by defendant SHERIFF as follows:  (a) denial to women, necessary menstrual pads and the ability to maintain personal and feminine hygiene, (b) direct and indirect discrimination based upon their sex regarding the provision of clothing; (c) direct and indirect discrimination based upon their sex regarding the provision of clothing; (d) (c) direct and indirect discrimination based upon their sex regarding the provision of clothing;     regarding exercise opportunities, access to exercise opportunities, (c) denial of equal access to classes and other inmate programming.

25.     The members of the class are so numerous as to render joinder impracticable.  In the year from July 2016 through June 2017 alone, over 9,700 women are incarcerated at SRJ.

26.   In addition, joinder is impracticable because, upon information and belief, many members of the class are not aware of the fact that their constitutional rights were violated and that they have the right to seek redress in court.  Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.  There is no appropriate avenue for the protection of the class members' constitutional rights other than a class action.

27.   The class members share a number of questions of law and fact in common, including, but not limited to:

a)   whether ACSO had policies and practices directly and indirectly discriminated against women prisoners in Santa Rita Jail based upon their sex which results in women prisoners being denied equal privileges and rights; subjected to harsher and more restrictive conditions of confinement; and subjected to sexual harassment as compared to male prisoners;

b)   whether ACSO and WELLPATH/CFMG jointly established and implemented policies specifically designed and intended to deny access to necessary and appropriate medical care to pregnant women in order to increase the profits of WELLPATH/CFMG and to reduce WELLPATH/CFMG and ACSO's costs;

c)   whether ACSO and ARAMARK jointly established and implemented policies specifically designed and intended to deny access to food that is adequate to maintain health of pregnant women and their unborn fetuses, in order to increase the profits of ARAMARK and to reduce ACSO's costs;

d)   whether at all times relevant to this Complaint Defendant WELLPATH/CFMG acted under color of State law; and,

e)   whether at all times relevant to this Complaint Defendant ARAMARK acted under color of State law.

28.   The Plaintiffs' claims are typical of those of the class.  Like the other members of the class, the Plaintiffs were victims of the Defendants' policy, practice, and/or custom of direct and indirect discrimination against women prisoners.

29.     The legal theories under which the Plaintiffs seek relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the Plaintiffs are typical of the harms suffered by the class members.

30.     The Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interests with members of the class, and will fairly and adequately protect the interests of the class.  The Plaintiffs have all been subject to conditions of confinement that violate the First, Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution.

31.     The Plaintiffs are represented by experienced civil rights and class action counsel. Plaintiffs' Counsel have the resources, expertise, and experience to prosecute this action.  Plaintiffs' Counsel know of no conflicts among members of the class or between the attorneys and members of the class.

32.     The Plaintiff class should be certified pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to class members, the interests of the Plaintiffs and potential class members are aligned, and a class action is superior to other available methods for fairly and efficiently adjudicating the case.

## STATEMENT OF FACTS

### General Conditions For Women Inmates At SRJ

33.     SRJ's treatment of and rules and regulations governing women prisoners as compared to men prisoners are more restrictive and far harsher than, SRJ's rules and regulations governing male prisoners.  Women prisoners have fewer freedoms, less access to exercise and opportunities for exercise, less access to out of cell time, and less access to classes and programming.

34.     Holding cells are in area called Intake, Transfer and Release ("ITR").  Any prisoner coming into or going out of SRJ must go through ITR, including each and every time a prisoner goes to court.  Male prisoners are always processed through ITR before women prisoners.  Because all prisoners entering or leaving SRJ on a given day arrive at ITR at approximately the same time, women prisoners are thus systematically held in holding cells for a far longer time than are male

prisoners.  Holding cells are concrete boxes, which are almost always very cold and filthy.  They are rarely cleaned and are full of garbage.  Because women are processed after the jail is finished processing the men, women are held for significantly longer periods of time in these awful holding cells.

35.     Women have fewer jobs available to them, and the jobs are not as good, and for fewer hours.

36.     The male workers are provided greater perks and freedoms, including the fact that in the worker pod for the male workers, the cell doors are open in the morning and left open all day, so that even when a male worker is not on shift, they are not locked in their cell at all.  Women workers do not have these perks or  freedom.

37.     Title 15 Section 1240 provides that prisoners should have 15 minutes to eat their meals.  When the women in HU 21 requested their full 15 minutes to eat a hot meal together on the tables of the housing unit, the deputies stated that the time for the meals would be deducted from their pod time.  After that, as retaliation for the women requesting their rights under California regulations, the deputies then refused to let the women in HU 21 out at all, and required all of the women to eat their meals inside their cells.  Male prisoners in HU 21 are not and have not been subjected to this type of restriction.  Male prisoners are permitted out of their cells to eat their meals, together, in the common area of the housing unit.

38.     Women have fewer educational classes available for them, and the classes are less relevant to what women are interested in, want to learn or which would provide real job skills.  Takisha Upshaw, during her four years of incarceration in Santa Rita Jail was never able to sign up for a single class.

39.     California Rules of Regulation, Title 15, Section 1265 states that "Each female inmate shall be provided sanitary napkins, panty liners or tampons as requested."  Defendant Sheriff does not comply with this section1265 Title 15.  Instead, plaintiffs and class members are permitted to request, only once a day, and upon request, are provided only 4 menstrual pads per day.  The pads are tiny and thin to begin with and have poor quality glue.  Most women have to use two or sometimes three pads at a time, in order to prevent bleeding through their clothes.  These pads only

last two hours at the most.  As a result, women routinely suffer from insufficient menstrual pads, such that women bleed through their clothes.  Because laundry is only once a week, women are forced to endure dirty bloody clothing for long periods of time.  And if the laundry is short, as it often is, a prisoner can be stuck in disgusting, filthy, blood stained clothes for longer than a week.

40.     Women prisoners in Santa Rita Jail, in preparation for their monthly menstrual cycle, start requesting menstrual pads, daily in advance.  However, defendant Sheriff has promulgated and enforce jail rules that bans "stockpiling" of menstrual pads, and if a deputy finds a woman prisoner with more than the allotted 4 menstrual pads, the deputy confiscates the pads, and subjects the woman prisoner to disciplinary action.  This policy and practice underscores defendant ACSO's policies to deny women the ability to maintain

41.     While State regulations mandate that women prisoners have clean laundry once a week, and clean underwear twice a week, women prisoners are never provided with clean underwear, much less once a week.  The laundry process at the jail does not get the blood stains out of the underwear so that underwear for women, distributed by the jail is normally stained and has pubic hairs stuck to it.  Many prisoners hand wash the supposedly clean laundry exchange underwear in the shower in a bucket.  When they do so, the water coming off the laundry exchange underwear is brown.  The condition of underwear distributed by SRJ is a major cause of the transmission of bacteria from vaginal fluids that are not laundered out by SRJ.  This has resulted in an epidemic of trichomonas vaginalis, or fungal infections among women prisoners.

42.     As to other clothing, SRJ staff frequently tells women prisoners that they ran have out of women's underwear.  This is especially difficult for women because ACSO's rules require women to wear bras, and the bras in the laundry are generally in the wrong sizes and in short supply.  Women have gotten fungal rashes on their breasts from the bras that have not been properly laundered.  Other clothing is also often returned from laundry exchange blood-stained and dirty.  Therefore, most women prisoners try to hand wash clothes to guarantee some level of personal hygiene.  Pre-Covid,  SRJ did not provide soap.  A prisoner had to purchase the body wash from the commissary to use for hand washing clothing.  After  Covid, the jail now provides small bars of Bob Barker soap which is very harsh and caustic to use.

43.     Except for panties and bras, the clothing provided by defendant Sheriff are neither designated nor manufactured for women.  All the other clothing, (all clothing except for panties and bras) have, as the smallest size, men's large.  For the majority of women, the tee shirts and jail outer wear is too large, particularly with the length of the pants, which must be repeatedly rolled up or else will cause a tripping hazard.  The socks are men's size socks and are always several inches too long.  Wearing too long socks with jail plastic slip on shoes that are too large, make it difficult for women to properly walk, much less be able to run and exercise.  No woman prisoner is provided shorts or boxers.  No woman prisoner is permitted to wear shorts.

44.     Defendant Sheriff has promulgated rules which prohibit only the women inmates from being out of cell unless they are fully dressed with all underwear, tee shirt and the top and bottom outer wear.  This includes for exercise.  Because of the size of the outwear, and the fact that the socks and plastic slip on shoes provided by defendant Sheriff, are generally significantly larger than the women prisoner's feet, most women find it difficult if not impossible, to engage in active movement, such as running or jumping, or other forms of vigorous aerobic exercise in the too-large pants and too-large socks, and plastic slip-on shoes without the threat of a tripping hazard.  The weight of the clothing and the size of the clothing binds the movement of women prisoner's arms and legs.  Furthermore, because only women (and not men) are not provided appropriate exercise clothing such as shorts, and required to wear underwear, tee shirt and all outerwear whenever they are out of cell, women more easily overheat when they try to exercise, and are deterred from exercising because they do not want to sweat into clothing that they have to wear for an entire week.  Male prisoners are permitted to exercise shirtless in just a pair of boxer shorts.  Defendant Sheriff's rule deter women prisoners from exercising and are objectively discriminatory against women prisoners based upon their gender.

45.     Women inmates at SRJ receive fewer privileges than men and are subject to more restrictions, with no valid penological interest.  Men are allowed to hand wash clothing and hang them from the bars of their bed.  Women are not and when they hang laundry off their beds, the guards confiscate these items.   Women have less access to yard time and exercise opportunities.  Santa Rita Jail has a Big Yard which has grass, is large and spacious, is open to the sky and has  a

view of the east bay hills.  Male prisoners , on a daily basis, have access to the Big Yard.   The large size of the yard, the view of the sky and the east bay hills gives relief from the oppression of jail. Women almost never have access to the Big Yard and are almost always given access for outside recreation only to a concrete pen that is jail structure on all sides and the top is covered with netting. There is no grass or open space in the concrete pen.   Women report that if they get access to the large yard, once a year, they are lucky.

46.      The women's small yard is a concrete pen about the size of a basketball court.   The men's yard is the size of several football fields, and has exercise equipment and exercise stations. The women's concrete pen has one basketball hoop and one rusted chin up bar.  Women prisoners' fewer privileges and have significantly less access to exercise and outdoor exercise when compared to male prisoners, is objectively discriminatory.

47.      Women prisoners at Santa Rita Jail regularly are deprived of and lack the ability to maintain personal sanitation; do so at the peril of being subjected to discipline and punishment; and are in fact subjected to discipline for the effort to maintain personal sanitation.    The jail provides a free kit to those who do not have funds to purchase commissary.  The free kit contains a bottle of body wash which is appropriate for use on body parts with mucus membranes.  For those who have funds to purchase commissary, the jail will refuse to provide a free kit, and so the women have to purchase their own soaps and shampoos which is appropriate for use on body parts with mucus membranes.    When a woman prisoner is disciplined, a common punishment is to deny the woman the ability to purchase commissary for some period of time.  Women are subjected to greater restrictions and discipline is more frequently handed out over minor infractions.   However, if the woman is not indigent, the jail refuses to provide the free kit and because a woman prisoner on discipline cannot purchase soap through the commissary, she will often be deprived of soap for the time period she is on discipline.  The Bob Barker soap provided by the jail has the active ingredient of benzethonium chloride which is harsh on the skin and especially caustic on mucus membranes. Because of its harsh and caustic qualities, women are unable to use the Bob Barker soap for feminine hygiene.  Therefore, when subject to discipline and the ban from purchasing commissary, a female prisoner who does not qualify for the free kit, is unable to purchase appropriate and

necessary soap and is unable to properly wash and maintain personal sanitation and feminine hygiene.  This is particularly onerous during the time of menstruation.  These jail rules are indirectly discriminatory against women, creating barriers and difficulties for women in maintaining necessary personal cleanliness and feminine hygiene.

48.   Defendant Sheriff has also promulgated rules banning prisoners from having plastic bags.  However, in HU 21, the showers are not in the cells, but are outside in the POD area.  Many women need to have a plastic bag in order to hold their comb, soap, shampoo and other items necessary for a woman's personal hygiene, and carry these items to the shower.  However, having such a plastic bag, again subjects the woman prisoners to discipline from the deputy, if the deputy sees the plastic bag.  The rule against plastic bags indirectly discriminates against women, creating barriers and difficulties for women in maintaining personal cleanliness and hygiene, which the male prisoners do not suffer.

49.   Prisoners are prohibited from having hair ties or other means of tying their hair up.  This rule indirectly discriminates against women because women generally have longer hair than men, and as a result have no means to tie up or back their hair or otherwise keep their hair tidy.  The hair grooming equipment which the jail provides are electric clippers, a curling iron and a hair dryer.  Electric clippers are useful for maintaining male hairstyles and most men's hair, particularly for men who buzz their hair.  Electric clippers are not usable for cutting women's generally longer hair  when compared to men. longer.  The jail does not provide or permit hair brushes.  The only hair care implements available are a comb with fine teeth that break on or gets easily snarled on longer hair, an afro pick, or a palm brush.  None of those items work as a hair brush for women and long hair.  Therefore, most women, during their incarceration in Santa Rita Jail, are unable to comb their hair, are unable to properly groom their hair and are unable to get haircuts.  The men, in housing unit 21 have a mirror in the common area of the housing pod, which they can use to perform self-grooming.  The women are not provided a mirror and cannot do self-grooming.  The rule against hair ties, the lack of hair brushes and the male oriented hair clippers indirectly discriminates against women, creating barriers and difficulties for women in maintaining personal appearances, which is especially detrimental when women have to appear in court, and are required

to appear in court with their face and hair in disheveled and unkempt physical state, whereas men are able to appear in court with tidy and neat hair.

50.     Furthermore, ACSO has installed surveillance cameras in the women's bathrooms and showers, with a direct view of women when they are on the toilet or in the shower.  The overwhelming number of deputies and technicians at Santa Rita Jail are male.  The presence of these surveillance cameras subject these women to invasion of their personal privacy, is a form of sexual harassment, and a deterrent for women to conduct personal hygiene and feminine sanitation.

51.     All women prisoners are subjected to the conditions described herein in paragraphs 33 through 50.

### Sheriff Ahearn's Private Contracts for Food & Medical Services

52.     Over the past five years, Sheriff Ahearn has overseen an unprecedented increase in the salaries of Sheriff's office personnel at Santa Rita Jail.  Salaries and benefits at SRJ have increased by $12.44 million dollars since 2013.  As a result, being a jail guard at SRJ is one of – if not the most – remunerative jobs in the entire country that a high school graduate with no college education can get.  A starting jail guards make approximately $100,000 per year in salary and benefits.  This is not counting overtime payments available.

53.     That $12.4 million dollar salary increase, and the $1.7 million increase in overtime between 2013 and 2018 amounted to almost 50% of the Sherriff's office SRJ budget increases over that period.

54.     Over the same period, while remuneration for Sheriff's office deputies and personnel at SRJ increased by nearly 18%, the SRJ jail population for whom the Sherriff was responsible, *declined*.

55.     According to ACSO, the average daily population at SRJ was 3,431 inmates in June 2013 and had fallen to 2,825 by June 2015.  Upon information and belief, the current average daily population is approximately 2,200.  Thus, the population at SRJ has declined by about 30% at the same time that remuneration for Sheriff's office deputies and personnel at SRJ increased by over 18%.

56.     Moreover, during this period, ACSO entered into contracts with private, for-profit companies to provide basic and crucial services to SRJ inmates.

*ACSO's Contract with WELLPATH/CFMG*

57.     In this regard, ACSO contracts with Defendant WELLPATH/CFMG to provide all health care services of any type needed by any inmate at SRJ.  WELLPATH/CFMG's contract specifies a set price based on average daily inmate population ("ADP").

58.     Crucially, the WELLPATH/CFMG contract specifies that WELLPATH/CFMG itself is solely responsible for all costs incurred in connection with any health care services provided to inmates outside the jail and that WELLPATH/CFMG is not entitled to and will not receive any reimbursement from ACSO for the cost of services provided to inmates by hospitals or by any non-WELLPATH/CFMG personnel. The cost for all such services is borne solely by WELLPATH/CFMG.

59.     ACSO's contract with WELLPATH/CFMG explicitly states that WELLPATH/CFMG will pay for any and all "inpatient hospitalization costs, emergency room visits, ambulance transportation expenses, outpatient surgeries, outpatient physician consultations, outside specialist fees, off-site diagnostic procedures."  If an inmate receives such medical services, WELLPATH/CFMG must pay the total cost of the medical care provided, "regardless of the level of cost incurred."

60.     The contract specifies that WELLPATH/CFMG alone will determine "the necessity and appropriateness of inpatient hospital care and other outside medical services."

61.     Incredibly, the contract also specifies that in the event a third-party payor such as an insurer pays for part or all of any medical service provided to an inmate outside the walls of SRJ, WELLPATH/CFMG must turn over half of that third-party payment to the Sheriff's office.  In other words, even if WELLPATH/CFMG is reimbursed for its costs for outside medical care provided to inmates, the Sheriff's office takes half of the reimbursement even though it paid nothing for the outside medical care.

62.     By requiring WELLPATH/CFMG to pay for any and all medical care provided outside of SRJ to any SRJ inmate, and by limiting WELLPATH/CFMG's ability to recover any

amount WELLPATH/CFMG pays for such care, ACSO's contract with WELLPATH/CFMG creates a financial incentive and imperative for WELLPATH/CFMG to refuse and withhold needed and appropriate outside medical services to all inmates, including pregnant inmates, when the needed and appropriate medical services consist of "inpatient hospitalization costs . . . outpatient physician consultations, outside specialist[s, or] off-site diagnostic procedures," among other services.

63.     By specifying that WELLPATH/CFMG alone will determine "the necessity and appropriateness of inpatient hospital care and other outside medical services," ACSO's contract with WELLPATH/CFMG enables WELLPATH/CFMG to refuse and withhold needed and appropriate outside medical services to SRJ inmates, including pregnant inmates, when the needed and appropriate medical services consist of "inpatient hospitalization costs . . . outpatient physician consultations, outside specialist[s, or] off-site diagnostic procedures," among other services.

64.     "[O]utpatient physician consultations, outside specialist[s and] off-site diagnostic procedures" within the meaning of the WELLPATH/CFMG contract include any outside or off-site OBGYN services, including prenatal care, provided to pregnant SRJ inmates.

65.     "[I]npatient hospitalization costs" within the meaning of the WELLPATH/CFMG contract includes hospitalization of an SRJ inmate to deliver a baby or for other prenatal care.

66.     The medical provider in the San Francisco County jail is not a for-profit correctional healthcare company such as WELLPATH/CFMG.  It is the County Department of Public Health, which has no financial incentive to deny care.

67.     The medical provider in the Contra Costa County jail is not a for-profit correctional healthcare company such as WELLPATH/CFMG.  It is the County Department of Public Health, which has no financial incentive to deny care.

68.     The price provisions of the WELLPATH/CFMG contract which create a financial incentive to deny care have had a devastating impact on the provision of medical services to inmates at SRJ, including pregnant inmates.  That impact is detailed below at Paragraphs 89 to 118.

*ACSO's Contract with ARAMARK*

69.     ACSO contracts with ARAMARK to prepare food for inmates at SRJ and to prepare food which is used to feed inmates at other Alameda County jails including Glen Dyer Jail, as well as adult facilities in Colusa, Solano, San Benito, San Joaquin, Amador and Lake counties, and a juvenile facility in San Joaquin County.  ARAMARK prepares 20,000 meals a day, with the labor of 150 inmate workers who are not paid but receive food treats.

70.     Through its contract with ARAMARK, ACSO instituted a 25% cut in the inmate food budget at SRJ.

71.     ARAMARK implemented the reduction in the inmate food budget at SRJ in the amount of $1.65 million.

72.     The cost reductions which ACSO instituted in the ARAMARK contract and implemented by ARAMARK have had a devastating impact on the quantity and quality of food provided to inmates at SRJ.  That impact is detailed below at Paragraphs 71 to 88.

**Food Shortages and Dangerous Food Conditions at SRJ**

73.     The kitchen at SRJ is staffed by inmate workers under the supervision of Defendant ARAMARK.  By 2016, inmates were no longer even consistently tested for communicable diseases before being permitted to work in the kitchen.

74.     Santa Rita's kitchen prepares food not just for prisoners in the jail, but also for other jails under the jurisdiction of ACSO.

75.     According to women inmate kitchen worker at SRJ, the kitchen at SRJ is filthy.[1] Birds live in the kitchen and bird droppings fall all over counter surfaces, including food preparation surfaces.  Rats run across the kitchen floor and there are frequently rat droppings in the food.  When this is brought to the attention of a paid ARAMARK supervisor, paid supervisors brush the rat droppings off the food and instruct inmate kitchen workers to continue working.

76.     Food in the kitchen is kept such that rats access it.  Bread is kept in plastic bags in open plastic crates.  Rats climb over the bread and chew open packages.  When bread bags are chewed by rats, a few pieces are thrown away but the rest of the bread is served to prisoners.

77.     Sandwich meat, primarily bologna, often is spoiled, with raised white spots of unknown origin and type on it.  That spoiled meat is given to prisoners to eat.

78.     Cooked beans are not properly stored, and not labeled, so that old, leftover beans are frequently reheated and served, or combined with newer cooked beans.  As a result, the beans decompose, and frequently become slimy and start to bubble as part of its bacterial decomposition.  These decomposing spoilt beans are regularly served to prisoners.

79.     Commercial kitchens normally have a daily clean-up crew which comes in and cleans all ovens, stoves, vent hoods, floors, and other surfaces and equipment in the kitchen.  Commercial clean-up crews normally come in the early morning, before a commercial kitchen opens.  Inmate kitchen workers have never seen a clean-up crew at the SRJ kitchen.  It is clear, simply by looking at the SRJ kitchen, that it is never cleaned.

80.     The walk-in refrigerators in the SRJ kitchen are disorganized and filthy.  There is no cleaning schedule for the refrigerators, which are seldom if ever cleaned.  Water collects on the floor, indicating condensation due to frequent temperature variations above acceptable food safety levels.

81.     Ingredients are not marked or dated when they are received into the kitchen so there is no way to track use-by dates of the inventory.  As a result, kitchen workers are unable to tell which ingredients should be used first or to follow standard first-in, first-out inventory control to prevent spoilage.  As an inevitable result, ingredients frequently spoil.  Sandwich meats are frequently become green or purple.  Beans become slimy and bubble.  Meals prepared from these spoiled ingredients are given to inmates to eat.

82.     Meals are the same day in and day out.  Even pregnant women do not receive sufficient amounts or types of food.  Day after day, week after week, month after month, prisoners are given:

Breakfast: oatmeal or Cream of Wheat with bread and canned fruit;

Lunch: Primarily Peanut butter sandwich or 1-2x a week, hard boiled eggs; once every two weeks or so some bologna, milk and 4 to 5 carrot nubs; a piece of fruit once or twice a week at most;

Snack: (for pregnant women only) Peanut butter sandwich, milk;

Dinner: Protein patty, potatoes, cooked carrots.

83.     In November, 2020, when the women kitchen workers, as whistle blowers, publicly described the conditions in the kitchen, the vermin, the rodents, the birds, the inadequate sanitation, Margarita, an Aramark employee, stated that she did not like the women workers because the women workers "complained" about the lack of sanitation in the kitchen.  As a result, all of the women kitchen workers lost their jobs preparing food, and lost the ability to work the second shift from 3:30  p.m.to 11p.m.  Instead, all of the women were relegated to a short shift from 8 to 11, and made to do all the dirty work, all the kitchen cleaning, which the men did not do.  With the shortened hours and the workload of all the cleaning, the women are highly pressured to go through the motions of cleaning, as with the cleaning work load, and the small women kitchen worker crew, it is not possible to actually get all the cleaning done, much less done right.

84.     In addition, as a result, the women kitchen received fewer perks, including food.  The main motivation for the women kitchen workers was to be able to eat a slightly higher quality of food because the jail food was so deficient, unsanitary and insufficient.  Furthermore, because women prisoners were locked down excessively, working was one of the few means that women had to get out of their cells and be active.  The men kitchen workers received none of these limitations, and instead received the additional perks of being allowed out of cell, all day, every day.

85.     Until 2019, on a daily basis, breakfast was served between 3:30 and 4:00 a.m. Pregnant inmates, who need rest, are woken at 2:00 a.m. to have vital signs checked, are then forced to get up at 4:00 a.m. if they want to have breakfast.  Many cannot, because they need to rest.  If a pregnant woman skips breakfast, she must wait until 12:00 noon for lunch.  From dinner to lunch is 19 hours, so a pregnant woman who cannot rise at 4:00 a.m. after having been woken at 2:00 a.m. for a blood pressure check must go 19 hours without food.

86.     Pregnant women are not provided with adequate amounts or types of food as defined by community standards memorialized in California Regulations governing the feeding of California inmates.  Pregnant women fail to gain weight as is necessary for a healthy pregnancy.

87.     Podworkers report that there are regularly vermin and vermin feces in the food and food trays. Plaintiff JOHNSTON reported that while serving meals, she saw both rodent feces in one person's food tray and another tray with limbs and a rodent fetus cooked into the beans and served. Plaintiff JOHNSTON brought this to the attention of Deputies Farmanian and Pope, who were on duty. One of Deputies Farmanian or Pope took a picture of the tray, treating it like it was a joke. The tray was then served to an inmate with instructions to "eat around it." Another time, when a prisoner showed one of the deputies evidence that a rodent had eaten part of her lunch, one of the deputies, Farmanian or Divine said, "Mice gotta eat too". As a result of the chronic unsanitary food preparation conditions, the infestation of rodents, wild animals and vermin in the kitchen, pregnant women receive inedible food, or are shorted food, and frequently are hungry.

88.     Food shortages led to frequent fights among the inmates for the little food that is available. For example, on March 20, 2018, a pregnant pre-trial detainee was given one extra serving of milk. Another inmate demanded that she turn over her extra milk. A physical fight then ensued over that extra milk between the second inmate and a third inmate. A second fight over milk also occurred during the same week.

89.     Plaintiff JOHNSTON was pregnant when she was arrested in early March, 2018 and booked into SRJ. WELLPATH/CFMG staff at SRJ confirmed her pregnancy upon her entry into SRJ. Plaintiff JOHNSTON was not provided the extra food that is required for pregnant women. Plaintiff JOHNSTON complained to the guards on Housing Unit 24 several times that she has not been given the required extra food and requested that she be given the food. Despite her requests, SRJ staff did not provide Plaintiff JOHNSTON with the extra food required to be given to pregnant inmates. Plaintiff JOHNSTON frequently fell asleep hungry.

90.     On March 10, 2018, despite the presence of extra trays at dinner, Defendant Deputy CAIN did not allow Plaintiff JOHNSTON to have any extra food. On March 11, 2018, while lined up for breakfast, Plaintiff JOHNSTON fainted from hunger.

91.     On March 21, 2018, Plaintiff JOHNSTON asked for an extra tray of food because she was still hungry and there were extra trays visible. The deputy on duty denied her request and

withheld the food as punishment citing as a reason that "you guys are being too loud."  Plaintiff JOHNSTON is a pre-trial detainee.

92.     On March 27, 2018, Plaintiff JACKSON, an inmate approximately 27 weeks pregnant at the time, was given food on a cardboard tray that was soggy and foul smelling because it was splattered underneath with food debris.  Plaintiff JACKSON asked the Deputy on duty, "would you eat this if the tray is soggy and smells bad?"  The Deputy said she would get Plaintiff JACKSON another tray, but did not.  On April 11, 2018 Plaintiff JACKSON was given spoiled milk to drink.

93.     Plaintiff JACKSON was pregnant with twins during her incarceration and due to the insufficient jail food, had difficulty with the required weight gain for healthy fetuses.

**Medical Care Is Grossly Inadequate At Santa Rita Jail**

94.     As a result of the cost provisions of ACSO's contract with WELLPATH/CFMG, medical care provided to SRJ inmates at SRJ is grossly inadequate.   In addition, SRJ inmates are regularly denied necessary and appropriate outside medical care by WELLPATH/CFMG because the provision of such care comes directly out of SFMG's bottom line profits. The following example of grossly inadequate and entirely withheld medical care are given by way of illustration only and not by way of limitation.

*General Medical Care*

95.     Savanah O'Neill is a Certified Addiction Treatment Counselor and Associate Clinical Social Worker who served as the Opioid Treatment Program Coordinator at SRJ from February, 2017 through December 6, 2017 as an employee of WELLPATH/CFMG.  She resigned her position with WELLPATH/CFMG due to the "unethical medical treatment of pregnant inmates that falls below the accepted standard of care" at SRJ.

96.     Standard treatment protocols mandate that pregnant women prisoners with opioid dependence of any type are to be initiated into methadone treatment or maintained in their current treatment during their incarceration.

97.     Despite this, beginning in or about October, 2017, WELLPATH/CFMG implemented its own, non-standard, practice.  Under its non-standard practice, WELLPATH/CFMG puts all

opioid dependent inmates into detox, regardless of the prisoner's physical condition or opioid use history. Although WELLPATH/CFMG maintains written protocols which call for it to initiate treatment for pregnant women using opioids, Ms. O'Neill witnessed at least two pregnant women who were placed into a fast and severe detox regimen. One of these pregnant inmates was given one 5 mg dose of methadone and told she would receive no further medication; the other was given 10 mg. Federal regulations, specifically 42 CFR Part 8 call for an initial dose of 40 mg on the first day of treatment, after which the dosage is increased every other day until cravings cease.

98.     The American College of Obstetricians and Gynecologists have issued an opinion that pregnant women should be maintained on methadone during their pregnancy and not placed in withdrawal. WELLPATH/CFMG and SRJ's treatment of pregnant prisoners with opioid dependence is contrary to the standards issued by the American College of Obstetricians and Gynecologists.

99.     WELLPATH/CFMG and SRJ's practice is also contrary to the practice at the San Francisco County Jail and the Contra Costa County Jail, both of which comply with the accepted standard practice that all pregnant prisoners with opioid dependence be maintained on methadone during the term of their incarceration. WELLPATH/CFMG and SRJ do not comply.

*Pregnancy-Related Medical Care*

100.    Plaintiff JOHNSTON entered SRJ while pregnant. Prior to her incarceration at SRJ, Plaintiff JOHNSTON was provided with a pregnancy treatment plan by the Native American Health Clinic. The plan called for a standard test, called a nuchal translucency scan or NT scan, at 10-12 weeks pregnancy to gauge various developmental indicators, including development of the spinal cord, as well as other developmental milestones. Plaintiff JOHNSTON has several times requested this test at SRJ. WELLPATH/CFMG staff initially told her only that "we will talk about it more." On March 17, 2018 WELLPATH/CFMG staff at SRJ denied her requests for the standard NT developmental scan.

101.    Plaintiff JOHNSTON has been diagnosed with gestational diabetes. She was scheduled to be taken to Highland Hospital on Friday, March 16, 2018 for testing. The test was administered instead by WELLPATH/CFMG at SRJ. WELLPATH/CFMG staff administered the

test incorrectly.  Blood sugar readings are supposed to be taken twice, once before being given a drink and again afterwards. The test was administered only after the drink was given.

102.   Plaintiff IBE gave birth while she was a pre-trial detainee at SRJ.  At about the 37th week of pregnancy, she was moved to O.P.H.U. (Out-Patient Housing Unit), where she was frequently not given the diet mandated for pregnant women.  Despite her requests, SRJ did not provide her with proper meals on these occasions.

103.   While Plaintiff IBE was being transported to Highland Hospital, a male deputy attempted to restrain her in the ambulance with a waist chain while she was in active labor.  Plaintiff IBE gave birth on November 9, 2017.  After the birth, Deputy Thomas said they needed to chain her to the bed, despite the facts that she had a high fever and complications, including a rip in her vagina that needed to be stitched up.  Plaintiff IBE was not permitted to hold or even touch her baby.

104.   On November 10, 2017, two deputies grabbed Plaintiff IBE's legs and chained her to the bed with leg irons.  Although the tear in her vagina had just been stitched, they chained her to the bed in a spread-eagle position, leaving her uncomfortable and in pain with two male guards in her room.

105.   Also, on November 10, 2017, a Highland Hospital pediatrician told Plaintiff IBE that the "County Sherriff made a rule" that "you cannot bond, hold, touch or see your baby."  Plaintiff IBE was not allowed any contact with her baby.

106.   Plaintiff ELLIS was approximately 20 weeks pregnant at SRJ when she began bleeding and spotting.  WELLPATH/CFMG placed her into the Infirmary, which consists of several small rooms, essentially cages, where she was totally alone.  She received no care other than periodic blood pressure readings.

107.   Until Plaintiff ELLIS was past four months pregnant, WELLPATH/CFMG staff continually gave her pamphlets about abortion and told her that "abortion is available," despite her repeated statements that she wanted to carry the child to term.  Similarly, Plaintiff ELLIS heard WELLPATH/CFMG staff repeatedly say that Plaintiff MOHRBACHER "needs to have an

abortion." SRJ guards have physically shaken and assaulted Plaintiff ELLIS, presumably in an attempt to induce a miscarriage.

108.   Plaintiff MOHRBACHER was pregnant when she entered SRJ.  Plaintiff MOHRBACHER has never been told of any of any "care plan" developed by WELLPATH/CFMG for her pregnancy.  Like all pregnant inmates at SRJ, Plaintiff MOHRBACHER was not allowed the three hours of outdoor recreation per week mandated for pregnant inmates.  Other than for a single week when all female inmates were allowed regular outdoor time, Plaintiff MOHRBACHER was permitted only two pregnancy weeks walks while incarcerated at SRJ.

109.   Plaintiff MOHRBACHER was seen by WELLPATH/CFMG staff in connection with her pregnancy.  The WELLPATH/CFMG staff had from the beginning of her pregnancy urged her to have abortion.  Plaintiff MOHRBACHER informed CGMG that she did not want an abortion and that she wanted to have the baby, the WELLPATH/CFMG staff.  Following this, WELLPATH/CFMG staff told Plaintiff MOHRBACHER that her baby was dead and that she should have an abortion.  Plaintiff MOHRBACHER knew that the baby was not dead and refused consent to an abortion.  WELLPATH/CFMG nonetheless scheduled Plaintiff MOHRBACHER for an abortion.  When Plaintiff MOHRBACHER refused to go, WELLPATH/CFMG had two male Deputies go to her Housing Unit and try to forcibly take her to have an abortion.  She resisted and refused, and when she again refused to agree to an abortion, the Deputies yelled at her and claimed she was on drugs.  Defendants Farmanian and Pope have told Plaintiff MOHRBACHER that she "needed to get" an abortion.  Defendant Pope told her that she must "obviously be on drugs, which is why you refuse" to abort the baby.

110.   Finally, one day in December, 2017, Deputies entered the Housing Unit at 6:00 a.m. and demanded that all inmates stand so that the Deputies could conduct a search.  Plaintiff MOHRBACHER was placed into solitary confinement, handcuffed, for an extremely long period of time.  After a significant amount of time, defendant DIVINE returned, moved Plaintiff MOHRBACHER to another room and conducted yet another strip search.  Plaintiff MOHRBACHER was bleeding vaginally due to the stress and harassment.  Although Plaintiff MOHRBACHER was not once found to be in possession of drugs at SRJ, Deputy DIVINE stated

that she was bleeding because she was "doing meth." During or shortly following this search, which was the third in less than a week, Plaintiff MOHRBACHER's continued bleeding and suffered a miscarriage. WELLPATH/CFMG never provided medical attention to Plaintiff MOHRBACHER in connection with her miscarriage.

111.    Plaintiff ZEPEDA was arrested and booked into SRJ on Sunday, August 13, 2017, at which time she was pregnant. On that day, WELLPATH/CFMG staff at SRJ administered a pregnancy test and confirmed the pregnancy. Plaintiff ZEPEDA informed WELLPATH/CFMG staff that she was not feeling well. Nonetheless, she was placed in a filthy holding cell with walls covered in human secretions, decaying food on the floor, and human waste in the cell and in the toilet. Because the toilet had human waste floating in it and no toilet paper, she could not use it and ended up urinating on her clothes.

112.    On the same day, although she continued to not feel well, Plaintiff ZEPEDA received no medical care. Eventually, WELLPATH/CFMG personnel spoke with her, but instead of trying to provide medical care, the WELLPATH/CFMG staff only told Plaintiff ZEPEDA that she could have an abortion anytime. The guards also encouraged her to have an abortion. When Plaintiff ZEPEDA requested medical attention, such care was refused and she was instead treated as a pest. Plaintiff ZEPEDA felt that the guards were trying to coerce her into aborting her fetus or, failing that, into suffering a miscarriage.

113.    By Thursday, August 17, 2017, four days after entering SRJ, Plaintiff ZEPEDA was bleeding very badly and did suffer a miscarriage. Grieving and distraught, she received no counseling or support of any kind.

114.    Other inmates, including Paramdeep Kaur, have also suffered miscarriages due to the filthy conditions, abuse by staff, and inadequate and dangerous food at SRJ, and due to the policy, custom and practice of ACSO and WELLPATH/CFMG to deny needed and appropriate medical care to pregnant women at SRJ.

115.    Adanna Ibe was pregnant and delivered her son at Highland Hospital. During the delivery, she experienced a vagina tear which required stitches. After the birth, but before she received stitches, male sheriff's deputies, insisted that she had to be chained by the leg, to her

hospital bed, even before she received any medical treatment.  This caused her severe pain and discomfort.

116.   After she received stitches, the deputies insisted that she had to be chained, spread eagle to the hospital bed, and forcibly chained Andanna.  She was allowed to see her baby, but not allowed to hold him.  She was told that the Sheriff and the County had policies forbidding her from holding or even touching her baby.  This caused her great emotional distress and she became exceedingly distressed and distraught.

<u>**Applicable Community Standards**</u>

117.   SRJ's treatment of women prisoners falls far short of acceptable conditions under the United States Constitution. The Eighth Amendment to the U.S. Constitution requires that correctional facilities "must ensure that inmates receive adequate food, clothing, shelter, and medical care."  *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)

118.   California Regulations provide a ready benchmark for what constitutes "adequate food, clothing, . . . and medical care."

119.   California Code of Regulations (hereinafter "CCR") § 1210(b) specifies that "[f]or each inmate treated for health conditions for which additional treatment, special accommodations and/or a schedule of follow-up care is/are needed during the period of incarceration, responsible health care staff shall develop a written treatment plan."

120.   CCR § 1248 specifies that, "The medical diets utilized by a facility shall be planned, prepared and served with consultation from a registered dietitian. The facility manager shall comply with any medical diet prescribed for an inmate.

121.   CCR § 1248 further specifies that, "[t]he facility manager and responsible physician shall ensure that the medical diet manual, which includes sample menus of medical diets, shall be available in both the medical unit and the food service office for reference and information. A registered dietitian shall review, and the responsible physician shall approve, the diet manual on an annual basis.

122.   CCR § 1248 further specifies that, "[p]regnant women shall be provided a balanced, nutritious diet approved by a doctor."

123.   CCR § 1240 specifies that, "[p]rovisions shall be made for inmates who may miss a regularly scheduled facility meal. They shall be provided with a substitute meal and beverage, and inmates on medical diets shall be provided with their prescribed meal."

124.   CCR § 1242 specifies that "Menus shall be planned to provide a variety of foods, thus preventing repetitive meals."

125.   CCR § 1241 specifies that "A wide variety of food should be served."

126.   CCR § 1241(b) specifies that "For . . . pregnant and lactating women, the requirement is four servings of milk or milk products" of 8 ounces of liquid milk per day.

127.   CCR § 1241(c) specifies that "The daily requirement of fruits and vegetables shall be five servings. At least one serving shall be from each of the following three categories:

128.    CCR § 1241(c)(1) specifies that "One serving of a fresh fruit or vegetable per day, or seven (7) servings per week."

129.   CCR § 1241(c)(2) specifies that "One serving of a Vitamin C source containing 30 mg. or more per day or seven (7) servings per week."

130.    CCR § 1241(c)(3) specifies that "One serving of a Vitamin A source, fruit or vegetable, containing 200 micrograms Retional Equivalents (RE) or more per day, or seven servings per week."

131.   CCR § 1241 further specifies that "Providing only the minimum servings outlined in this regulation is not sufficient to meet the inmates' caloric requirements. Additional servings from the dairy, vegetable-fruit, and bread-cereal groups must be provided in amounts to meet caloric requirements."

132.   Further, CCR § 3050(a)(3) specifies that: "Pregnant inmates shall receive two extra eight ounce cartons of milk or a calcium supplement if lactose intolerant, two extra servings of fresh fruit, and two extra servings of fresh vegetables daily."

133.   CCR § 1230 specifies that, "[t]he responsible physician, in cooperation with the food services manager and the facility administrator, shall develop written procedures for medical screening of inmate food service workers prior to working in the facility kitchen"

134.   In addition, CCR § 1243 specifies that, "Facilities shall have a written food service plan that shall comply with the applicable California Retail Food Code."

135.   Among other things, the California  Retail Food Code § 113980 requires that "All food shall be manufactured, produced, prepared . . . stored . . . and served so as to be pure and free from . . . spoilage; . . . shall be protected from dirt, vermin, . . . droplet contamination, overhead leakage, or other environmental sources of contamination; shall otherwise be fully fit for human consumption."

136.   As alleged above in Paragraphs 89-118, ACSO and ARAMARK comply with none of the standards cited above which clearly define what constitutes the provision of adequate foods to inmates.

137.   CCR § 1260 specifies that, "The standard issue of climatically suitable clothing to inmates held after arraignment . . . shall include (c) clean undergarments . . . (2) for females - bra and two pairs of panties."  Further, CCR § 1262 specifies that, "Undergarments and socks shall be exchanged twice each week."

138.   CCR § 1248 also provides that "The inmates' personal undergarments and footwear may be substituted for the institutional undergarments and footwear specified in this regulation. This option notwithstanding, the facility has the primary responsibility to provide the personal undergarments and footwear."

139.   CCR § 1263 specifies that "Written policy and procedures shall specify handling of laundry that is known or suspected to be contaminated with infectious material."

140.   As alleged above in Paragraphs 71-88, ACSO complies with none of the standards cited above which clearly define what constitutes the provision of adequate foods to inmates.

141.   CCR § 1265 specifies that "Each female inmate shall be issued sanitary napkins and/or tampons as requested."  Further, California Penal Code § 3409(a) specifies that "Any incarcerated person in state prison who menstruates shall, upon request, have access to, and be

allowed to use, materials necessary for personal hygiene with regard to their menstrual cycle and reproductive system...at no cost…."

142.   As alleged above in Paragraphs 33-51, ACSO complies with none of the standards cited above which clearly define what constitutes the provision of materials necessary for personal hygiene with regard to inmates' menstrual cycle and reproductive systems, upon request.  Instead at Santa Rita Jail, women prisoners are only permitted to request – no more than once a day – for four (4) menstrual pads, a wholly inadequate supply to meet the needs of female inmates' menstrual cycle.

143.   Under CCR § 3355.2(b), all inmates with a confirmed pregnancy are entitled by California law to a treatment and care plan regimen.

144.   As alleged above in Paragraphs 89-118, ACSO and WELLPATH/CFMG do not comply with standards clearly defined in CCR § 3355.2(b).  To the contrary, it is the policy, custom and practice of ACSO, carried out in concert with WELLPATH/CFMG, to deny inmates with a confirmed pregnancy with access to such a treatment and care plan.  For example, and not by way of limitation, no plan of care is determined by an Obstetrical Physician or Obstetrical Nurse Practitioner, diagnostic studies are not ordered as needed, and obstetrics examinations are not scheduled in accordance with the schedule mandated by CCR § 3355.2(c).

145.   CCR § 3355.2(e) requires that pregnant women who are "receiving methadone treatment, shall be enrolled in the Methadone Maintenance Program and recommended for immediate transfer to the California Institution for Women."

146.   As alleged above in Paragraphs 94-97, ACSO and WELLPATH/CFMG do not comply with standards clearly defined in CCR § 3355.2(e).  To the contrary, it is the policy, custom and practice of ACSO, carried out in concert with WELLPATH/CFMG, to refuse to enroll such pregnant women in the Methadone Maintenance Program or to recommend them for immediate transfer to the California Institution for Women.

147.   Women who have opiate addiction issues are denied medical care and thrust into the general population housing unit.  These women are forced to withdraw cold turkey, and this withdrawal frequently involves vomiting or loss of bowel or bladder control.  The housing units

consist of 9 sets of bunk beds.  Pregnant women and women with disabilities are issued the bottom bunk.  Frequently these women withdrawing from opiates are placed on the top bunk, forcing pregnant women to be on the receiving end of vomit or other human secretions, and the terrible smell.  Given the short supply of clean linens, and cleaning supplies and equipment, pregnant women are forced to endure these conditions for hours at a time.

## FIRST CLAIM FOR RELIEF

### DEPRIVATION OF FEDERAL CIVIL RIGHTS
### UNDER 42 U.S.C. § 1983 AGAINST ACSO

148.  Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

149.  At all relevant times herein, ACSO has been responsible for operating the Santa Rita Jail.

150.  At all relevant times herein, Defendant ACSO has established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the Plaintiffs' and the class members' constitutional rights granted pursuant to 42 U.S.C. § 1983, including those under the First, Eighth and Fourteenth Amendments.

151.  At all relevant times herein, ACSO has followed a custom, policy and practice of imposing greater restrictions and other hardships on women prisoners at SRJ than on male prisoners, with no valid penological purpose.  By way of example only, these greater restrictions and hardships include, but are not limited to, denial of the right to eat together in the common area of the pod, and when the women exercised their first amendment rights to request their full fifteen minutes to eat the meat, Defendant ACSO retaliated by refusing to allow the women out into the common area at all, and forcing all of them to eat their meals in their cells; denial of appropriate clothing; denial of access to laundry and undergarments that meet minimum community standards; denial of materials necessary for personal hygiene with regard to their menstrual cycle and

reproductive system; denial of the means to maintain personal appearances including appropriate hair care, as compared to the men; denial of equal access and opportunities as compared to men, for exercise and outdoor exercise; denial of equal access as compared to men, to work; denial of equal access and opportunities to classes; and, denial of equal privileges including out of cell times and privileges.

152.    The policies, practices and customs described above are the official policies, practices and customs of Defendant COUNTY OF ALAMEDA and ACSO, and are the direct and proximate cause of the harm and discrimination described herein in violation of the First Amendment, the Eighth Amendment's bar against cruel and unusual punishment and the Fourteenth Amendment's equal protection and bar against punishment.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

**SECOND CAUSE OF ACTION**

**DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AGAINST ACSO AND WELL-PATH/ CFMG**

153. Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

154.    At all relevant times herein, Defendant WELL-PATH/CFMG acted under color of State law.

155. At all relevant times herein, Defendant WELLPATH/CFMG established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the Plaintiffs' and the class members' constitutional rights granted pursuant to 42 U.S.C. § 1983, including those under the Eighth and Fourteenth Amendments.   All of the aforementioned acts of the Defendant WELLPATH/CFMG, their agents, servants and employees, were carried out jointly with ACSO under the color of state law.

156.    At all relevant times herein, Defendant ALAMDEA COUNTY SHERIFF'S OFFICE delegated to Defendant WELLPATH/CFMG the traditional public function of determining and

controlling the provision of medical services to pregnant inmates, in such a way as was deliberately calculated to deny such inmates access to adequate medical care. The denial of necessary and appropriate medical services was imposed in order to reduce WELLPATH/CFMG's costs under its contract with ASCO, specifically pursuant to the pricing provisions of that contract which penalized WELLPATH/CFMG for allowing the provision of any outside medical care, regardless of the medical necessity of such care.

157. At all relevant times herein, Defendant WELLPATH/CFMG acted jointly and intentionally with Defendant ACSO, pursuant to a customary plan to restrict Plaintiffs and class members from obtaining medically necessary and appropriate medical care.

158. At all relevant times herein, Defendant WELLPATH/CFMG intentionally participated with the Defendant ACSO in a customary plan to restrict Plaintiffs and class members from obtaining medically necessary and appropriate medical care.

159. At all relevant times herein, an inmate's right to necessary and appropriate medical services was clearly established. The contours of the right to necessary and appropriate medical services was made sufficiently clear by, among other things, the California Regulations cited herein.

160. At all relevant times herein, Defendants WELLPATH/CFMG and ACSO acted with deliberate indifference to the violation of Plaintiff's class members' rights. As shown above, WELLPATH/CFMG and ACSO were aware of the substantial risk of serious harm to a pregnant inmate's health and safety created by the denial of necessary and appropriate medical services and appropriate nutrition and WELLPATH/CFMG and ACSO deliberately disregarded that risk. At all relevant times, the California Regulations cited herein put WELLPATH/CFMG and ACSO on actual notice that such substantial risk of serious harm is not one that today's society chooses to tolerate.

161. At all relevant times herein, there existed a pervasive entwinement between Defendant WELLPATH/CFMG and Defendant ACSO, in that WELLPATH/CFMG was at all relevant times delegated by ACSO the traditional public function of determining and providing medical care to inmates.

162.  The deprivation of Plaintiffs' and class members' constitutional rights was caused by the close nexus between Defendant WELLPATH/CFMG and Defendant ACSO that was created by the direct role of Defendant ACSO in enforcing WELLPATH/CFMG's determination to deny and withhold necessary and appropriate medical care to SRJ inmates.

163.  The close nexus between Defendants WELLPATH/CFMG and ACSO is the legal cause of injuries to Plaintiffs and the class as alleged herein and, as a result, Plaintiffs and the class have sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

Wherefore, plaintiffs and the prisoner class they represent request relief as outlined below.

## THIRD CLAIM FOR RELIEF

## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AGAINST ACSO AND ARAMARK CORRECTIONAL SERVICES LLC

164.  Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

165.   At all relevant times herein, Defendant ARAMARK CORRECTIONAL SERVICES LLC acted under color of State law.

166.  At all relevant times herein, Defendant ARAMARK established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the Plaintiffs' and the class members' constitutional rights granted pursuant to 42 U.S.C. § 1983, including those under the Eighth and Fourteenth Amendments.  All of the aforementioned acts of the Defendant ARAMARK, their agents, servants and employees, were carried out under the color of state law.

167.  At all relevant times herein, Defendant ALAMDEA COUNTY SHERIFF'S OFFICE delegated to Defendant ARAMARK the traditional public function of feeding municipal inmates and allowed and enabled Defendant ARAMARK to cause constitutionally inadequate food to be provided to SRJ inmates and to deny SRJ food that is adequate to sustain health.  The denial of food

that is adequate to sustain health was imposed in order to reduce ARAMARK's costs under its contract with ASCO.

168.  At all relevant times herein, Defendant ARAMARK acted jointly and intentionally with Defendant ACSO, pursuant to a customary plan to prevent Plaintiffs and class members from having access to food that is adequate to maintain health.

169.  At all relevant times herein, Defendant ARAMARK intentionally participated with the Defendant ACSO in a customary plan to retaliate against women kitchen workers who, as whistle-blowers, publicly reported on the unsanitary kitchen, and the food handling practices that violate California's health and safety codes,

170.   At all relevant times herein, an inmate's right to food that is adequate to maintain health was clearly established.  The contours of the right to food that is adequate to maintain health was made sufficiently clear by, among other things, the California Regulations cited herein.

171.   At all relevant times herein, Defendants ARAMARK and ACSO acted with deliberate indifference to the violation of Plaintiff's class members' rights.  As shown above, ARAMARK and ACSO were aware of the substantial risk of serious harm to an inmate's health created by the denial of food that is adequate to maintain health and ARAMARK and ACSO deliberately disregarded that risk.  At all relevant times, the California Regulations cited herein put ARAMARK and ACSO on actual notice that such substantial risk of serious harm is not one that today's society chooses to tolerate.

172.  At all relevant times herein, there existed a pervasive entwinement between Defendant WELLPATH/CFMG and Defendant ACSO, in that ARAMARK was at all relevant times delegated by ACSO the traditional State function of feeding inmates.

173.  The deprivation of Plaintiffs' and class members' constitutional rights was caused by the close nexus between Defendant WELLPATH/CFMG and Defendant ACSO that was created by the direct role of Defendant ACSO in enforcing ARAMARK's determination to prevent Plaintiffs and class members from having access to food that is adequate to sustain health.

174.  The close nexus between Defendants ARAMARK and ACSO is the legal cause of injuries to Plaintiffs and the class as alleged herein and, as a result, Plaintiffs and the class have

sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

## FOURTH CLAIM FOR RELIEF

## DEPRIVATION OF RIGHTS

### Under Article I, Section 17 of the California Constitution Against All Defendants

175. Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

176.   By their policies and practices described above, Defendants subjected Plaintiffs and the Class they represent, to a substantial risk of harm and injury from inability to meet women's menstrual and feminine hygiene needs, inadequate medical care and insufficient nourishment to maintain life for pregnant women, and abuse treatment and hardships.  These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Class's ongoing deprivation of rights secured by the California Constitution, Article I, Section 17.

177.   Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

## FIFTH CLAIM FOR RELIEF

## DEPRIVATION OF RIGHTS

### UNDER ARTICLE I, SECTION 7 OF THE CALIFORNIA CONSTITUTION AGAINST DEFENDANTS ALAMEDA COUNTY AND ACSO

178. Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

179. By their policies and practices described above, Defendants inflicted direct and indirect discrimination against women prisoners solely on the basis of these prisoners are women.

By their policies and practices described above, Defendants subject Plaintiffs and the Prisoner Class they represent, to substantial violations of their right to equal protection in relationship to access to laundry, means to maintain personal and feminine hygiene; out of cell time; access to exercise; outdoor exercise; work; and classes and programs.  These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Prisoner Class' ongoing deprivation of rights secured by the California Constitution Article 1, Section 7.

180.  Defendants have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request the Court to:

1. Certify the Class of women prisoners at Santa Rita under Rule 23, F.R. Civ P., and also the Subclass of women prisoners who are pregnant, and permit the named plaintiffs and their counsel to represent the Class and Subclass and to proceed accordingly. <u>In the alternative</u>, hold certification of the broad class in abeyance pending further development of the grounds for it, but recognize the Subclass for all purposes connected with its plea(s) for equitable relief herein.

2. Make findings of fact reflecting the general and specific failings and inadequacies of both groups of defendants' approaches to and practice in the care of pregnant prisoners, the pattern and practice of defendants' non-feasance and maltreatment of pregnant prisoners, and defendants' violations of statutory, regulatory and constitutional requirements in dealing with pregnant prisoners.

3. Initiate a serious effort, perhaps with a Rule to Show Cause, to bring about defendants' early compliance with the community treatment program law Penal Code §1170., and/or any

other feasible and available means and steps to get and keep pregnant women out of the Santa Rita jail.

4. In the event a ready process for getting and keeping plaintiffs out of the jail is not readily found, and to the extent and for the time any pregnant women are ordered held in the Sheriff's custody, enter a preliminary and permanent Injunction which will,

A. **Prohibit defendants from**:

a. coercion or pressure on pregnant prisoners to consent to a preterm termination of their pregnancy;

b. placing pregnant prisoners in solitary confinement, and/or ordering them to submit to multiple strip searches and body cavity searches without first utilizing less punitive and intrusive means including urine tests and having objectively reasonable grounds to suspect them of hiding contraband;

c. placing pregnant prisoners outdoors without adequate outerwear, and clothing;

d. holding pregnant prisoners outdoors against their will for any length of time, or keeping the heat down in residential units, and the bright lights on all night;

e. punishing or threatening to punish women prisoners for exercising their right to free speech during meals or during 'pod time';

f. touching or searching pregnant plaintiff's food unless defendants' hands are covered in clean, and new sanitary gloves;

g. coerce or pressure or attempt to persuade pregnant prisoners to agree to abortions;

h. retaliating against women for exercising their First Amendment rights.


**And**,

B. **Affirmatively Order and direct defendants to**:

a. Fully comply with all applicable state statutes and regulations, and develop a legitimate individual treatment plan for each pregnant prisoner, *and carry it out completely*!

b. Fully comply with all applicable state statutes and regulations for a sufficient, balanced, nutritious diet, prepared in a sanitary manner,  for pregnant women approved by a doctor;

c. Fully comply with state law on provision of <u>sufficient</u> appropriate materials for each woman prisoner "necessary for (1) personal hygiene with regard to her menstrual cycle and reproductive system" (Penal Code §3409) during the entire duration of her incarceration under the custody of defendants;

d. No less than the minimum outdoor exercise prescribed by state regulations equal to the men

e. Appropriate clothing, including shorts or exercise clothing for women, and socks that fit;

5. Enter a preliminary and permanent injunction on behalf of the broad Class of women prisoners which will counter and remedy the County defendants' broader unconstitutional practice(s) of discrimination against women in general, compared to men, as complained of and to be shown further;

6. Award compensatory and punitive damages to individual plaintiffs against defendants in amounts to be determined at trial;

7. Award costs and fees for this action, including attorneys' fees;

8. Grant such other and further relief as this Court deems appropriate.

**JURY TRIAL DEMAND**

A JURY TRIAL IS DEMANDED on behalf of Plaintiffs.

DATED:          April 5, 2021          **LAW OFFICE OF YOLANDA HUANG**


  __*/s/ Yolanda Huang*_____

Yolanda Huang



**DENNIS CUNNINGHAM**

1

  /s/ *Dennis Cunningham*

2

Dennis Cunningham

3

4

5

*Counsel for Plaintiffs*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28