Peter G. Bertling (SBN 131602)
Jemma Parker Saunders (SBN 227962)
Bertling Law Group
21 East Canon Perdido Street, Suite 204B
Santa Barbara, CA 93101
Telephone: 805-879-7558
Facsimile: 805-869-1597
peter@bertlinglawgroup.com
jemma@bertlinglawgroup.com

Attorneys for Defendant
CALIFORNIA FORENSIC MEDICAL GROUP

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACLYN MOHRBACHER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>**ALAMEDA COUNTY SHERIFF'S OFFICE,** GREGORY J. AHERN, BRETT M. KETELES, TOM MADIGAN, T. POPE, T. RUSSELL, D. SKOLDQVIST, LT. HATTAWAY, SGT. CALAGARI, DEPUTY DIVINE (#512), DEPUTY DEBRA FARMANIAN, DEPUTY WEATHERBEE (#238), DEPUTY TANIA POPE, DEPUTY WINSTEAD, DEPUTY CAINE, ALAMEDA COUNTY and John & Jane DOEs, Nos. 1 - 50.<br>**and,**<br>**The CALIFORNIA FORENSIC MEDICAL GROUP**, a corporation; its Employees and Sub-Contractors, and Rick & Ruth ROEs Nos. 1-50,<br>**and,**<br>**ARAMARK CORRECTIONAL SERVICES, LLC**, a Delaware Limited Liability Company; its Employees and Sub-Contractors, and Rick and Ruth ROES Nos. Nos. 1-50,<br><br>Defendants. | Case No. 3:18-cv-00050-JD<br><br>**DEFENDANT CALIFORNIA FORENSIC MEDICAL GROUP'S TRIAL BRIEF**<br><br>**Pretrial Conference**<br>Date: May 4, 2023<br>Time: 1:30 p.m.<br>Courtroom: 11, 19th Floor<br><br>**Trial**<br>Date: May 22, 2023<br>Time: 9:00 a.m.<br>Courtroom: 11, 19th Floor<br><br>Action Filed: January 4, 2018<br>Judge: Hon. James Donato |

3:18-cv-00050-JD

DEFENDANT CALIFORNIA FORENSIC MEDICAL GROUP'S TRIAL BRIEF

Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. ("CFMG") hereby submits the following Trial Brief:

## I. STATEMENT OF FACTS

The original complaint was filed by six named plaintiffs on January 4, 2018. It alleged a variety of claims pertaining to the treatment of pregnant inmates at the Santa Rita Jail ("SRJ") and was accompanied by a request for a Temporary Restraining Order. After three amended complaints and several rounds of related briefing pertaining to preliminary injunction motions and motions to dismiss (none of which the Court ruled upon), the parties reached a settlement in principle on May 14, 2018. (ECF No. 100.) Thereafter, the parties engaged in protracted settlement negotiations over the course of almost three years in the hopes of reaching a final agreement. These negotiations were ultimately unsuccessful.

As to CFMG, Plaintiffs claim, as a proposed putative class, that the medical care and treatment of pregnant inmates at the SRJ is unconstitutional. Plaintiffs' Motion for Class certification is under submission by this Court and no ruling has been made.

Different versions of plaintiffs' Complaints have claimed they are (1) coerced into unwanted abortions, (2) denied access to healthcare providers, and (3) not referred to outside providers because, under their contract with the County, CFMG bears the cost of sending patients to these outside providers, and it is their policy to put "profits" over patient care. However, the individualized medical records and testimony from the Plaintiffs themselves, contradict these allegations. Plaintiffs' operative Fourth Amended Complaint includes no claim for negligence or allegations of deliberate indifference against any Wellpath employee.

Plaintiffs have not made a clear statement regarding the CFMG policies and practices which are allegedly unconstitutional. They have not established, through expert opinion, the requisite causal link between these unconstitutional policies and practices and the injuries they have allegedly sustained. Plaintiffs' counsel never deposed any of the Wellpath providers who treated the Plaintiffs. Plaintiffs have not alleged that any

individual Wellpath provider (1) negligently treated them, or (2) were deliberately indifferent to their serious medical needs.

## II.   STATEMENT OF FACTS RELATED TO INDIVIDUAL PLAINTIFFS

### A. Christina Zepeda

Ms. Zepeda was booked into the SRJ on August 13, 2017, and underwent an intake health screening and it was determined she was 4 months pregnant. She was immediately signed up to receive prenatal care. Ms. Zepeda admitted she had not received any pre-natal care before being booked into SRJ.

On August 14, 2017, Ms. Zepeda had a fetal ultrasound which revealed her fetus had died. On August 15, 2017, she was admitted to the OPHU for closer monitoring and care related to the diagnosis of fetal demise. Ms. Zepeda was closely monitored for the next two days. She was discharged from the OPHU on the August 16, 2017. The following day she was re-admitted because she complained of pain in her lower right and left quadrant.

On the morning of August 17, 2017, Dr. Magat transferred Ms. Zepeda to Highland Hospital for further evaluation and care. She returned to the Santa Rita OPHU that afternoon and was closely monitored. She told CFMG staff several times she wanted to return to her regular housing unit.

On August 18, 2017, Ms. Zepeda was cleared to return to her regular housing unit, with instructions to continue taking her prescribed medications, monitor her cramping and bleeding, and alert medical staff if she had any increased cramping or bleeding. Plaintiffs have identified no constitutionally deficient policy or practice which caused Ms. Zepeda any harm. Instead, she alleges her mistreatment and abuse by custody staff caused her miscarriage.

### B. Andanna Ibe

Ms. Ibe knew she was pregnant when she was booked into the SRJ. She was immediately provided with information and referrals to the ob-gyn clinic, and participated in the SRJ doula program, where she had two doulas who visited her during pregnancy, attended to her during her delivery and for the following day. Ms. Ibe's claim

against CFMG is specifically that her prenatal constipation was not properly treated by CFMG staff. However, due to her constipation, Ms. Ibe was moved to the Outpatient Housing Unit (OPHU), which is located within the jail's infirmary so she could be more closely monitored and treated with appropriate medication until her constipation resolved. Her baby was born without complications.

The remaining claims made by Ms. Ibe are unrelated to CFMG. *In addition, Plaintiffs' expert, Dr. Sorem, never reported she reviewed Ms. Ibe's deposition, nor opined regarding any aspect of her care.*

### C. Erin Ellis

Ms. Ellis was booked into SRJ on October 31, 2017, and approximately four to five weeks pregnant. She received immediate prenatal care, counseling, fetal ultrasound, and regular prenatal follow up appointments with both the CFMG clinic and at Highland Hospital throughout her incarceration.

Ms. Ellis was admitted to the OPHU on December 4, 2017 for complaints of cramping and a single episode of spotting. Following evaluation and monitoring, she was discharged from the OPHU the following morning and returned to her regular housing unit after denying any further vaginal bleeding. The remainder of her pregnancy and prenatal care was routine, unremarkable and provided in compliance with CFMG's appropriate policies, practices, and procedures.

Ms. Ellis testified the CFMG staff advised her that abortion was an option available to her when they provided her the prenatal care and counselling that was required during her first trimester. She testified CFMG staff never coerced her into having an abortion. *In addition, Dr. Sorem, never reported she reviewed Ms. Ellis' deposition, nor opined regarding any aspect of her care.*

### D. Jaclyn Mohrbacher

Ms. Mohrbacher was a federal prisoner housed in the SRJ. On 11/13/17, Ms. Mohrbacher was seen in OB Clinic by a CFMG Nurse Practitioner (NP) due to previous history of vaginal bleeding and other medical concerns. She denied any current vaginal spotting or pelvic pain. During this examination, with patient consent, CFMG

determined it would be appropriate to send Ms. Mohrbacher to Highland Hospital for a fetal ultrasound to rule out an ectopic pregnancy.

Ms. Mohrbacher had the fetal ultrasound at Highland Hospital on 11/14/17. It revealed a single IUP (intrauterine pregnancy) without FHTs (fetal heart tones). Highland Hospital recommended a follow up beta-hCG (pregnancy hormone) measurement in 2-3 days and a repeat ultrasound as clinically warranted.

On 11/16/17, Ms. Mohrbacher was seen by the CFMG NP for follow up to Highland Hospital's exam to rule out ectopic pregnancy. On 11/16/17, blood was drawn for beta-hCG testing, as recommended by Highland Hospital. Ms. Mohrbacher denied any spotting, abdominal cramping/pain, or feeling un-well. She reported ongoing morning sickness that was manageable.

On 11/20/17, Ms. Mohrbacher was seen by a CFMG NP for another repeat beta-hCG. During this appointment, she denied any bleeding, cramping, abdominal/pelvic pain. She reported minimal morning sickness and had no questions or concerns at this time.

On 11/27/17, Ms. Mohrbacher saw Dr. Lascha Pierce, an OB-GYN physician working on behalf of CFMG at the SRJ. Ms. Mohrbacher had a fetal ultrasound during this appointment which again showed *no fetal cardiac activity* consistent with a missed abortion (i.e., a fetal demise without expulsion of pregnancy). The sonogram results were discussed with Ms. Mohrbacher, and she was scheduled for a D&C (dilation and curettage) to remove the pregnancy. Absent this procedure, severe consequences such as sepsis can result.

On 12/01/17, a CFMG nurse noted Ms. Mohrbacher was refusing to go to Highland Hospital for a blood draw prior to her D&C which was scheduled for the next week. The nurse counselled Ms. Mohrbacher regarding the importance of having this procedure done, but Ms. Mohrbacher stated "I'm refusing all medical treatment here. I'm gonna deal with it when I get to prison." Ms. Mohrbacher was informed of the dangers (i.e., sepsis) of refusing treatment, but she was adamant and repeatedly refused care, including appropriate monitoring to rule of infection or sepsis.

On 12/04/17, Ms. Mohrbacher was seen by a CFMG NP. She reported she has been sentenced and would be moved across the street in the next two weeks. Ms. Mohrbacher refused her upcoming appointment at Highland Hospital and stated "I don't feel like there's anything wrong with my pregnancy" and she would "get medical care across the Street." Ms. Mohrbacher denied vaginal bleeding or pelvic pain. Her non-viable pregnancy diagnosis was again discussed, and she was educated that typically the body will spontaneously miscarry 2-4 weeks following the diagnosis of a non-viable pregnancy. The nurse practitioner noted "It has been nearly 4 wks of no growth and no heartbeat, so the chances of the patient needing medical intervention are increasing." Ms. Mohrbacher affirmed her awareness of this but continued to decline her upcoming appointments, stating repeatedly that she will "get care across the street in their medical."

On 12/15/17, Ms. Mohrbacher seen by the CFMG NP for follow up. She had declined a sonogram the day prior. She stated she felt fine, denied any fever/chills, malaise, pain, cramping, or vaginal spotting. Ms. Mohrbacher continued to decline a D&C or any assistance at this time. The OB-GYN physician discussed with Ms. Mohrbacher her risk for sepsis due to her non-viable pregnancy. Ms. Mohrbacher stated she understood and agreed to notify staff if she has any fever/chills, malaise. The plan of care was to continue to monitor vitals every shift.

On 12/22/17, Ms. Mohrbacher saw the CFMG NP for her weekly assessment related to her non-viable pregnancy. Her vital signs were stable, and she continued to deny malaise, fever, chills, pain, pelvic pain, or vaginal bleeding/spotting. The NP again discussed with Ms. Mohrbacher the risks of prolonging her missed abortion, including a risk for sepsis. Ms. Mohrbacher stated she was aware of the risks and would be moved "across the street any day now, but definitely within the next 2 wks." Ms. Mohrbacher stated she would prefer to deal with her missed abortion across the street. She was counseled regarding the importance of a back-up plan if she continued to be in custody at SRJ. She stated she would have the D&C if she was still incarcerated at the SRJ in two weeks.

Subsequently, Ms. Mohrbacher admitted that sometime during the end of December 2017, she knew she had a miscarriage. However, she did not report this incident to anyone in medical. Instead, but she allowed medical staff to continue to monitor her for missed abortion throughout January until she was transferred to Federal prison.

### III.    CAUSES OF ACTION

Plaintiffs allege two causes of action against CFMG for 1) Deprivation of Federal Civil Rights under 42 U.S.C. 1983 and 2) Deprivation of Rights under Article 1, Section 17 of the California Constitution.

<u>Deprivation of Federal Civil Rights under 42 U.S.C. 1983</u>.  Plaintiffs allege that CFMG established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the Plaintiffs' and the class members' constitutional rights granted pursuant to 42 U.S.C. § 1983, including those under the Eighth and Fourteenth Amendments.  Plaintiffs allege that CFMG acted with deliberate indifference to the violation of Plaintiff's class members' rights and restricted Plaintiffs and class members from obtaining medically necessary and appropriate medical care.

<u>Deprivation of Rights under Article 1, Section 17 of the California Constitution</u>. Plaintiffs allege that CFMG by its policies and practices subjected Plaintiffs and the Class they represent, to a substantial risk of harm and injury from inability to meet women's menstrual and feminine hygiene needs, inadequate medical care, and insufficient nourishment to maintain life for pregnant women, and abuse treatment and hardships. Plaintiffs allege that these policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Class's ongoing deprivation of rights secured by the California Constitution, Article I, Section 17.

### IV.    STATEMENT OF APPLICABLE LEGAL STANDARD

Following years of litigation, the only remaining claim against CFMG, though they are articulated in two separate causes of action, is an unspecified *Monell* cause of action pursuant to 42 U.S.C. §1983.  In *Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978), the

Supreme Court held that municipalities are subject to liability under section 1983, not "based on theories akin to *respondeat superior*," but on a "fault-based analysis." *Oklahoma City v. Tuttle*, 471 U.S. 808, 818 (1985). To establish municipal liability under section 1983, as recognized in *Monell*, Plaintiffs must show at least one of the following, in addition to the other elements, such as causation, for liability: (1) conduct pursuant to an official policy inflicted the injury; (2) the constitutional tort was the result of a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity;" (3) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (4) an official with final policy-making authority "delegated that authority to, or ratified the decision of, a subordinate." *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008). *Monell*."). When alleging liability under *Monell*, Plaintiffs must proffer facts on all of the following:

    a. Identify the challenged policy or custom;

    b. Explain how the policy or custom is deficient;

    c. Explain how the policy or custom caused the harm; and

    d. Reflect how the policy or custom amounted to deliberate indifference, i.e. show how the deficiency involved was obvious and the constitutional injury was likely to occur.

E.g., *Harvey v. City of S. Lake Tahoe*, No. CIV S-10-1653 KJM EFB PS, 2012 U.S. Dist. LEXIS 51876, at *30 (E.D. Cal. Apr. 12, 2012), citing *Young v. City of Visalia*, 687 F.Supp.2d 1141, 1149 (E.D. Cal. 2009). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); accord *L.A. Police Protective League v. Gates*, 907 F.2d 879, 890 (9th Cir. 1990) ("proof of random acts or isolated events are insufficient to establish custom"). Even to just survive a motion to dismiss, Plaintiffs must "put forth additional facts regarding the specific nature of the alleged 'policy, custom, or practice.'" *A.E. ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012).

Here, despite five years of litigation, plaintiffs have not yet specified what policies or procedures they claim are constitutionally deficient, or any other aspect of a *Monell* claim. There has been a vague reference to "putting profits over patients" but no evidence or specific examples of such conduct has been put forth as proof of the same. Indeed, the opposite is true, and plaintiffs rely on inaccurate facts. First, all CFMG's policies related to pregnancy and prenatal care are equal to the "gold standard" NCCHC guidelines for nationwide appropriate care.

Second, and by way of an example of plaintiffs unabashed reliance on inaccuracies, plaintiffs claim Ms. Mohrbacher was denied a sonogram because CFMG did not want to pay the costs for care at Highland Hospital. However, Ms. Mohrbacher was a *federal inmate*, a fact of which she is intimately aware. As a federal inmate, the federal government pay all costs for her care, rather than CFMG or Alameda County. So, how can CFMG be putting profits over patients if there was zero cost to CFMG to provide care? This question, like many others, has been unanswered by plaintiffs, but the erroneous allegations continue.

Moreover, as this case is exclusively a *Monell* claim, acts of individual negligence, or claimed negligence are of no import to *Monell* liability. Pursuant to *Monell* vicarious liability for section 1983 causes of action is specifically disallowed. *Monell v. Dept. of Social Services,* 436 U.S. 658 (1978). In *Monell,* the Supreme Court held that municipalities (inclusive of private entities serving in such capacities as CFMG) are subject to liability under section 1983, not "based on theories akin to *respondeat superior*," but on a "fault-based analysis." *Oklahoma City v. Tuttle,* 471 U.S. 808, 818 (1985). Under *Monell,* "[a] single mistake does not give rise to municipal liability," *Vandenburg v. Cty. of Riverside,* 722 F. App'x 657, 658 (9th Cir. 2018)) and "proof of random acts or isolated events are insufficient to establish custom, policy or practice." *Hernandez Castro v. City of Hanford,* 546 F.Supp.2d 822, 826 (E.D. Cal. 2008)). Accord*, Tuttle,* 471 U.S. at 823-824 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell.*"). It is unclear at best what plaintiffs will utilize as evidence at trial or specifically describe as unconstitutional by

CFMG. CFMG contends there is simply no basis for any of plaintiffs' allegations, vague as they may be, and plaintiffs lack sufficient facts to state this *Monell* claim against it.

V.  **CLASS CERTIFICATION**

Plaintiffs have moved for class certification. CFMG has opposed Plaintiffs' motion for class certification and no ruling regarding whether the putative class shall be certified has been made. Should a class be certified, it would require discreet specification, requisite notice to the class to exercise their options (opt-out/opt-in) and possibly a different structure to the trial and evidence.

VI.  **DAMAGES**

Plaintiffs have requested injunctive relief. However, the did not identify the specific relief they are requesting until April 17, 2023, when Ms. Huang emailed CFMG's counsel with a supplemental report of their expert, Dr. Kimberlee Sorem. CFMG objects to the admission of Dr. Sorem's supplemental report, or any opinions related thereto, at trial. It is irrelevant, untimely and extremely prejudicial to defendant. *After more than 5 years of litigation*, it was not until April 17, 2023, that Plaintiffs produced any expert report which identified the policies CFMG needs to implement in order to provide adequate medical care to pregnant patients.

Plaintiffs have not filed their motion to supplement, but should that occur, CFMG will fully support its' opposition with pertinent facts and law. If the motion is granted, in order to avoid any prejudice to CFMG, it will require that (1) discovery be reopened, (2) CFMG be given the opportunity to designate experts to rebut Dr. Sorem's opinions, and (3) a continuation of the May 22, 2023, trial date.

Dated: April 20, 2023

Respectfully submitted,

BERTLING LAW GROUP
*/s/ Peter G. Bertling*
Peter G. Bertling
Jemma Parker Saunders
Attorneys for Defendant
CALIFORNIA FORENSIC
MEDICAL GROUP